UNITED STATES of America

v.

Walter ZIRPOLO, Robert E. Jacks, Colonial Pipeline Company, Karl T. Feldman, Glenn H. Giles, Ben D. Leuty, Rowland Tompkins Corporation, Bechtel Corporation, Gates Construction Corporation, Gates Equipment Corporation.

Appeal of Robert E. JACKS, in No. 18137.

Appeal of COLONIAL PIPELINE COMPANY, in No. 18138.

Appeal of Karl T. FELDMAN, in No. 18139.

Appeal of Ben D. LEUTY, in No. 18140.

Appeal of ROWLAND TOMPKINS CORPORATION, in No. 18141.

Appeal of BECHTEL CORPORATION, in No. 18142.

Nos. 18137–18142.

United States Court of Appeals, Third Circuit.

Argued Dec. 3, 1970.

Decided Feb. 19, 1971.

Rehearing Denied July 1, 1971.

John E. Toolan, Toolan, Romond & Burgess, Perth Amboy, N. J., for Robert E. Jacks.

Warren W. Wilentz, Wilentz, Goldman & Spitzer, Perth Amboy, N. J., for Colonial Pipeline Co. (Jack Vickrey, Atlanta, Ga., Frederic K. Becker, Harold A. Kuskin, Perth Amboy, N. J., on the brief).

Adrian M. Foley, Jr., Pindar, McElroy, Connell, Foley & Geiser, Newark, N. J., for Karl T. Feldman (Kenneth F. Kunzman, Newark, N. J., on the brief).

Simon H. Rifkind, Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for Ben D. Leuty (Paul J. Newlon, Jay Greenfield, John J. Barry, Alan L. Schlosser, New York City, on the brief).

Joseph E. Brill and Arthur P. Lawler, New York City, for Rowland Tompkins Corp. (John L. Pollok, New York City, on the brief.)

Paul Haerle, San Francisco, Cal., Shanley & Fisher, Newark, N. J., for Bechtel Corp. (Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., on the brief).

Sidney M. Glazer, Atty., Criminal Division, U. S. Dept. of Justice, Washington, D. C. (Will Wilson, Asst. Atty. Gen., on the brief), for appellee.

Before KALODNER, SEITZ * and ALDISERT, Circuit Judges.

---

\* Judge Seitz did not participate in the decision of this case.

1. § 1952, the anti-racketeering statute, provides:

   (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

   (1)․ distribute the proceeds of any unlawful activity; or

   (2) commit any crime of violence to further any unlawful activity; or

   (3)․ otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

   and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

2. The District Court for the District of New Jersey sits in Newark, Trenton, and Camden. Jurors are chosen from the geographical areas (vicinages) surrounding these stations.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

A federal grand jury in Newark, New Jersey, returned a nine-count indictment charging two conspiracies and seven substantive violations of 18 U.S.C. § 1952.[1] The indictment became the target of more than 40 pretrial defense motions, one of which sought dismissal on the basis of alleged systematic exclusion of and discrimination against women in compiling the grand jury lists. The district court denied this motion, United States v. Zirpolo, 288 F.Supp. 993, 1014 (D.N.J.1968), on the strength of its prior decision in United States v. American Oil Co., 286 F.Supp. 742, 745 (D.N.J.1968):

> "There has been no showing of any exclusionary procedure directed at a cognizable class forming a component of a fair cross-section of the community. Both men and women are represented in substantial numbers on all jury lists, even if disproportionately."

Though several grounds for reversal are assigned in these appeals, we address ourselves solely to the contention that the procedure utilized in the selection of the grand jury which returned the indictment is violative of federal law.

The procedure for grand jury selection in the District of New Jersey, Newark vicinage,[2] at the time in question is not in dispute. As set forth in the brief of appellant Colonial Pipeline Company, and accepted by the government:

> The clerk of the court maintains on file cards approximately 10,000 names

collected from voter registration and organization membership lists of nine counties in the Newark area. The cards are segregated, within each county, by sex. When directed by the Court to draw a panel of grand jurors, the jury official proceeds as follows:

a. 350 names are taken from the segregated file drawers by county and sex in order to provide the following distribution of potential grand jurors * * * Men, 246; Women, 104.

b. The 350 cards are shuffled and deposited into the jury wheel.

c. From the jury wheel, 100 names (in the case of a regular grand jury) or 125 names (in the case of a special grand jury) are then drawn by the jury commissioner and the deputy clerk, and a typewritten list prepared showing the names in the order drawn. The persons are then summoned to appear for jury duty.

It is conceded that women comprise approximately 52.5 percent of the New Jersey population over 21 years of age.

In selecting the grand jury which returned the instant indictment, the names of 93 men (74.4 percent) and 32 women (25.6 percent) were drawn; 51 men and 20 women were excused, resulting in a revised grand jury panel of 42 men and 12 women. The actual grand jury was composed of the first 23 persons—of whom 5 were women—whose names remained after striking the names of those excused or unavailable.

Although this is the first time this selection procedure has been before us for review, the practice was the subject of exhaustive treatment by the New Jersey District Court in United States v. American Oil Co., *supra*. See also 249 F.Supp. 130 (D.N.J.1965), 253 F.Supp. 783 (D.N.J.1966). One explanation for the procedure was offered:

The Clerk of this Court has explained that the same general pattern is disclosed in the selection of grand and petit jurors, and that the panels drawn are initially weighted in favor of men. The object of this practice is stated to be not to exclude or limit women from participating on juries, but to achieve a better balance of men and women on juries in the light of the experience, over a period of at least 24 years, that more men than women request to be and are, for valid reasons, excused from jury service. 249 F.Supp. at 132.

Assuming that a weighted balance between the sexes was the objective of this unusual practice, we note that the aggregate statistics of the twenty regular and special grand jury panels drawn from April, 1958, through February, 1966, showed more women, 63.3 percent, requesting excuses than men, 50.2 percent, resulting in revised jury panels in the proportion of 76.6 percent men and 23.4 percent women.[3] Moreover, a review of the history of the selection procedure supports an alternate conclusion that there was never any rational explanation for the practice and that, "like Topsy, it just grew."[4] Indeed, inter-

3. The aggregate of names drawn for the twenty regular and special grand juries impaneled from April 1, 1958, to February 14, 1966, the date on which the instant grand jury was convened, amounted to 1,255 men and 520 women, or a ratio of 70.7 percent to 29.3 percent. Six hundred thirty men and 329 women were excused from service; revised lists ultimately contained the names of 625 men and 191 women.

4. Made part of the record in United States v. American Oil Company, Criminal No. 153–65 in the District Court for the District of New Jersey, was an affidavit of James H. Bennett, Esq. This has been incorporated as part of the record before us by affidavit of Harold A. Kuskin, Esq.:

* * * * *

3. A study of the various sources discloses that the inclusion of women on federal jury lists in the Federal District of New Jersey resulted primarily from the efforts of the League of Women Voters of New Jersey to obtain some representation of women on jury lists and was a part of a general

views in 1966 with veteran federal judges, including members of this court, disclosed no recollection of how the prac-

tice of disproportional representation originated.[5].

women's rights movement taking place in the 1930's. Chronologically, the inclusion of women on federal jury roles in this District developed as follows:

During and prior to 1936, various women's organizations, particularly the League of Women Voters of New Jersey, actively attempted to obtain representation of women on jury lists.

On April 21, 1936, Federal Judge Clark, then Chief Judge of the District of New Jersey, after having presided in a case in which a woman attorney represented one of the parties, revealed that he was contemplating the use of women as jurors.

On July 23, 1936, Judge Clark spoke before the Essex Junior Bar Conference, stating that he had been having a "little trouble" with his colleagues in his effort to have women serve as federal jurors. He told the meeting that he hoped to have women on federal juries by November, 1936.

On September 10, 1936, Judge Clark announced that women would sit on juries in criminal trials for the first time in Essex County when the Court opened on November 4, 1936, for its Fall Term. The newspaper report continued: "Having this as an opening wedge, it is believed some women's organizations, which have backed legislation for service of women on juries in Essex County courts, will redouble their efforts."

On October 14, 1936, it was announced that 35 percent of the 800 residents of North Jersey who had been drawn for federal jury service were women. This panel was drawn for criminal trials for the term beginning November 4, 1936.

On November 3, 1936, it was reported that of 70 persons living in North Jersey summoned for federal jury service, 24 were women.

On January 18, 1937, it was reported in the Newark Evening News that the League of Women Voters of New Jersey had been urging the impaneling of women jurors.

On March 5, 1937, Judge Clark announced that women would serve for the first time on a federal grand jury to be drawn the following day at Trenton, New Jersey. On March 6, 1937, it was reported that nine of the 50 names placed in the panel from which the

grand jury would be drawn were those of women.

On April 6, 1937, a federal grand jury was sworn in before Judge Clark. This was the first time that women actually served on a federal grand jury in New Jersey. Six of the 23 grand jurors were women.

4. The records in the office of the clerk of the United States District Court for New Jersey (Newark), show that for grand juries sworn on the following dates, the number of men and women serving were:

| DATE SWORN | MEN | WOMEN |
|---|---|---|
| April 2, 1963 | 17 | 6 |
| November 6, 1963 | 18 | 5 |
| April 7, 1964 | 19 | 4 |
| November 4, 1964 | 17 | 6 |
| January 5, 1965 | 17 | 6 |
| April 6, 1965 | 16 | 7 |
| November 3, 1965 | 15 | 8 |

5. A report in the Newark Evening News of February 15, 1966, states that the federal grand jury currently sitting in Newark, sworn on February 14, 1966, consists of six women and 17 men.

5. Affidavit of Merritt Lane, Jr., Esq., filed in United States of America v. American Oil Company, et al., *supra*, made part of the record of these proceedings:

\* \* \* I have interviewed Angelo W. Locascio, Esq., Deputy Clerk in charge of the Newark Office of the United States District Court, District of New Jersey, and Michael Keller, Jr., Esq., Clerk of the Court, and have been advised by both of them that they have been unable to find any records relating to the circumstances under which women were included in federal jury lists; nor could they find any records concerning the practice of placing the names of over twice as many men as women in the jury wheel; nor did either Mr. Locascio or Mr. Keller have any personal knowledge of the reason for the adoption of the practice.

3. I have interviewed The Honorable Philip [Phillip] Forman, former District Judge for the District of New Jersey and currently sitting on the United States Court of Appeals for the Third Circuit; The Honorable Thomas F. Meaney, District Court Judge for the District of New Jersey; The Hon-

The government suggests that appellants may not be heard to complain without proof of prejudice. But the Supreme Court has heretofore disposed of the contention that prejudice must be demonstrated. In Ballard v. United States, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946), it stated:

> But reversible error does not depend on a showing of prejudice in an individual case. The evil lies in the admitted exclusion of an eligible class or group in the community in disregard of the prescribed standards of jury selection. The systematic and intentional exclusion of women, like the exclusion of a racial group, Smith v. Texas, 311 U.S. 128 [61 S.Ct. 164, 85 L.Ed. 84], or an economic or social class, Thiel v. Southern Pacific Co., supra [328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181] deprives the jury system of the broad base it was designed by Congress to have in our democratic society. It is a departure from the statutory scheme * * * The injury is not limited to the defendant— there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.

Conceding that a total exclusion of women, condemned in Ballard, would have invalidated the indictment, the government presses the argument enunciated in United States v. American Oil Co., supra, and relied upon by the court below, that a percentage exclusion of qualified females is not unlawful.

Basic tenets of our common law, as well as the provisions of the federal grand jury statutes, compel us to reject this conclusion. It has been a tradition in our law that a "proper jury * * * developed in harmony with our basic concepts of a democratic society and a representative government * * * [must be] a body truly representative of the community. Smith v. Texas, 311 U. S. 128, 130, [61 S.Ct. 164, 85 L.Ed. 84]." Glasser v. United States, supra, 315 U.S. at 85, 62 S.Ct. at 472. The insistence that the jury be "drawn from a cross-section of the community" is a uniquely "American tradition," Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); the English "limitations * * * in the historical common law concept of the jury as a body of one's peers do not prevail in this country." Glasser, supra, 315 U.S. at 85, 62 S.Ct. at 472. And, although we cannot guarantee that the jury as finally selected will truly reflect this democratic standard, we do require that prospective jurors be selected "without systematic and intentional exclusion" of any group. Thiel, supra.

Whether the exclusion be total, as in Ballard, or only partial, as here, in denying representation to a substantial percentage of women, the ultimate objective of achieving a true cross-section of the community is ill-served. Any deliberate interference—irrespec-

orable Thomas G. Walker, former District Court Judge for the District of New Jersey; Charles Jaeckel, Deputy Clerk of this Court in 1936, and Mrs. William Runyon, a former employee of the Clerk's Office of this Court. I have also caused to be interviewed the Honorable William F. Smith, former District Court Judge for the District of New Jersey now sitting on the United States Court of Appeals for the Third Circuit; The Honorable Gerald McLaughlin, Judge on the United States Court of Appeals for the Third Circuit; and William H. Tallyn, Clerk of this Court from 1943 to 1956. None of

these persons have knowledge of the circumstances under which women were first called as jurors in this Court and none of them have any recollection of the origin of the practice of proportionate limitation of women on jury panels.

4. In none of the interviews with the above-named persons was any indication given by them that any study had been made concerning the adoption, use or continuation of the procedure utilized in this Court of placing names in the jury wheel in the ratio of more than two men to one woman.

tive of purpose [6]—with a random jury selection from a list of all qualified citizens cripples the cross-section ideal.[7] In *Thiel, supra,* invalidating a verdict in a civil action because day laborers were excluded from a federal jury panel, the Court cautioned:

> This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographic groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.

328 U.S. at 220, 66 S.Ct. at 985.

Thus, while a particular grand or petit jury need not "be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group," Swain v. State of Alabama, 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1964), the law requires that the "standards and designs prescribed by Congress be followed." Rabinowitz v. United States, 366 F.2d 34, 59 (5 Cir. 1966).

Prior to 1957 there was little uniformity in the selection of federal jurors. The divergent laws of forty-eight states imposed different standards of eligibility for federal jury service. The 1957 Civil Rights Act amendment to the jury service provisions of the Judicial Code of 1948 was designed to eliminate this

6. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may one by one lead to the irretrievable impairment of substantial liberties. Glasser v. United States, 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680 (1942).

7. We recognize that proportional representation in the jury selection procedure is not constitutionally mandated, Hoyt v. Florida, 368 U.S. 57, 69, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). Yet even though our inquiry here, as in *Ballard, supra,* does not reach the Constitution, our rejection of proportional exclusion is buttressed by the reasoning of several constitutionally-grounded cases. In Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967), and Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), the Court held that although blacks were not totally excluded from juries a *prima facie* case of the denial of equal protection was made out by a showing of deliberate limitation of representation. In *Whitus,* the record indicated 42.6 percent of the male population and 27.1 percent of taxpayers were black, but only 9.1 percent of the grand jury venire and 7.8 percent of petit jury were black. In *Jones,* the corresponding percentages were 30.7 percent and 19.7 percent and 5 percent. In *Jones* and *Whitus* the Court significantly described their claims as ones based on "systematic exclusion" of blacks even though there was not a total exclusion. Moreover, in both cases the Court emphasized "the disparity between the percentage of Negroes on the tax digest and those on the venires." *Jones,* 389 U.S. at 24, 88 S.Ct. at 4; *Whitus,* 385 U.S. at 552, 87 S.Ct. at 647.

In Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953), the Court addressed itself to seventy years of interpreting the meaning of the equal protection clause and declared that the practice which interdicted the Constitution was a course of conduct which "operate[d] to discriminate in the selection of jurors * * *." Although no blacks appeared on the jury lists in *Avery,* four were found in Williams v. Georgia, 349 U.S. 375, 378, 75 S.Ct. 814, 99 L.Ed. 1161 (1955).

See also Muniz v. Beto, 434 F.2d 697 (5 Cir. 1970).

diversity and to divest the federal system of those inequities which inhered in certain state practices.[8]  It provided: "any citizen of the United States who has attained the age of twenty-one years * * * is competent to serve as a grand or petit juror." 28 U.S.C. § 1861. In establishing uniform standards of competency for federal jurors, "Congress was enacting a Civil Rights Act and intended to confer an additional civil right, i. e., the right to be a federal juror," *Rabinowitz, supra,* 366 F.2d at 54.[9]  The New Jersey jury commissioner and the clerk denied this right to a substantial segment of qualified women citizens of the Newark vicinage.

In addition, 28 U.S.C. § 1863 provided:

(a) A district judge for good cause may excuse or exclude from jury service any person called as a juror.

(b) Any class or group of persons may, for the public interest, be excluded from the jury panel or excused from service as jurors by order of the district judge based on a finding that such jury service would entail undue hardship, extreme inconvenience or serious obstruction or delay in the fair and impartial administration of justice.

(c) No citizen shall be excluded from service as grand or petit juror in any court of the United States on account of race or color. * * *

As the Fifth Circuit ably expressed in *Rabinowitz, supra,* 366 F.2d at 53: "It would seem anomalous for Congress to create elaborate procedures for the district judge to excuse or exclude persons from jury service and at the same time to silently vest broader discretion in the unregulated hands of the clerk and the jury commissioner."

We find that the Newark practice made three unwarranted departures from the congressional schema: (1) it permitted the jury commissioner and the clerk to exclude or excuse from a jury panel those who by law were qualified to serve; (2) the criteria for exclusion were not those delineated with specificity in § 1863(b), and (3) there was no finding by a district judge of the statutory criteria; indeed the record is devoid of a rational explanation for the institution and continuation of the two-to-one male sex ratio.

Thus, the important consideration is not simply whether there was 100 percent or 50 percent exclusion of the female sex from the grand jury panel. Rather, the question is whether authority for the practice may be found in the statute.  We conclude not only that the procedure was unauthorized, but that it constituted a patent violation of both the spirit and letter of federal statutory jury selection standards.  The ineluctable result was "a less representative cross-section than a selection drawn from the statutorily qualified pool * * * [destroying] the 'right' to serve on juries which Congress intended to confer, as well as [destroying] the

---

8. This was the Church modification of the O'Mahoney Amendment.  See remarks of Senators Church, Kefauver and O'Mahoney, 103 Cong.Rec. 13154.

9. See Hoyt v. Florida, *supra,* 368 U.S. at 60, n. 2, 82 S.Ct. at 162:
   From the First Judiciary Act of 1789, § 29, 1 Stat. 73, 88, to the Civil Rights Act of 1957, CRA, 71 Stat. 634, 638, 28 U.S.C. § 1861—a period of 168 years— the inclusion or exclusion of women on federal juries depended upon whether they were eligible for jury service under the law of the State where the federal tribunal sat.  See Ballard v. United States, 329 U.S. 187, 191–192 [67 S.Ct. 261, 91 L.Ed. 181] ;  Glasser v. United States, 315 U.S. 60, 64–65 [62 S.Ct. 457, 86 L.Ed. 680].  By the Civil Rights Act of 1957 Congress made eligible for jury service "Any citizen of the United States," possessed of specified qualifications, 28 U.S.C. § 1861, 28 U.S.C.A. § 1861, thereby for the first time making qualifications for federal jury service wholly independent of those prescribed by state law.  The effect of that statute was to make women eligible for federal jury service even though ineligible under state law.  See United States v. Wilson, D.C., 158 F.Supp. 442, affirmed, 5 Cir., 255 F.2d 686.

broad based cross-section Congress has designated for federal juries." Abbott v. Mines, 411 F.2d 353, 355 (6 Cir. 1969).

Any grand jury so selected has been improperly convened, and any indictment returned therefrom is void. Accordingly, any conviction based thereon shall not be permitted to stand. We conclude that because the procedure utilized to select the grand jury in the case at bar departed from the congressional mandate, the indictments were invalid, and the convictions will be reversed.

We recognize that the decision we reach here is at variance with two circuit decisions relied upon by the New Jersey District Court in American Oil Co., *supra*: Chance v. United States, 322 F.2d 201 (5 Cir. 1963) and King v. United States, 346 F.2d 123 (1 Cir. 1965). Technically, it is possible to distinguish *Chance* on the facts, for there the jury commissioner and the clerk performed no overt act to exclude any segment of the Florida community from participating on the federal grand jury. The majority reasoned that the Civil Rights Act of 1957 imposed no affirmative requirements on the officials in gathering names for the jury box and that "the law as it now stands places the officials under no mandatory or positive command; they are, on the contrary, controlled by one negative requirement: they may not discriminate, directly or indirectly." 322 F.2d at 205. Applying this standard to a procedure whereby the jury was selected from the list of all registered male voters and only those registered women voters who volunteered for jury duty, the court found no overt act of discrimination. Nonetheless, we prefer not to rest on this technical distinction and instead express our disagreement with the result reached by the majority in *Chance*; we are more persuaded by the dissent of Judge, now Chief Judge, Brown which accepted the

rationale of United States v. Hoffa, 196 F.Supp. 25, 31 (S.D.Fla.1961):

Could it be said in the present case that a jury panel from which all registered voters had been intentionally excluded was truly representative of the community? This Court does not think so. It is evident that a jury panel * * * [excluding] all women from jury service except the very few who registered for jury service in the State Courts, is not a fair representation of the community.

The grand jury was drawn from a panel which was selected contrary to the requirements of law; and since it is not necessary to show prejudice affecting any of the defendants, the indictment must be dismissed.

Moreover, it can now be said that there is questionable vitality to the panel decision in *Chance* in view of the later en banc decision of *Rabinowitz, supra*.[10]

We have extreme difficulty with the laconic pronouncement in *King*, which treated in three paragraphs the propriety of excluding in a jury panel drawn from 29 cities and towns, including Boston, the names of all Boston citizens between the ages of 21 and 25 and over the age of 70. It was conceded that although these citizens were not qualified for jury service under Massachusetts law, the federal statute would have included them. The court commented that it need not reverse "simply to impress upon the district court the inadvisability of accepting the Massachusetts jury exemptions as appropriate in the federal court [where that court] has taken steps to assure that future juries will be drawn from the broader age bases." We are not impressed by reasoning which admits error, but washes it away with the suggestion of prospective regularity.

Because the invalidation of a grand jury selection process used in a federal judicial district carries with it potential-

---

10. *Cf.*, the Jury Selection and Service Act of 1968, 28 U.S.C., § 1863(b) (2) which now specifically provides that the names of prospective jurors may be selected from voter registration lists or the lists of actual voters of the political subdivision within the district or division.

ly pervasive ramifications, we deem it important to consider the possible retroactive application of our holding. Of course, the great majority of criminal cases arising in the New Jersey District will not, in any event, be affected by the holding of this case. The Jury Selection and Service Act of 1968, P.L. 90–274, 82 Stat. 53, amending 28 U.S.C. § 1861 et seq., expressly prohibits the exclusion of women as a group from jury service. Moreover, even in those cases which arose prior to the adoption of the new federal jury standards, a challenge to the array of grand jurors must have been timely made; it is otherwise deemed to have been waived. Fed.R. Crim.Pro. 6(b); 12(b) (2), (3); Agnew v. United States, 165 U.S. 36, 17 S. Ct. 235, 238, 41 L.Ed. 624 (1897); Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); United States v. Hoffa, 7 Cir., 367 F.2d 698, 709–710 (1966); Wright, Federal Practice and Procedure, Criminal § 102, at 159.

In passing on the question of retroactivity, the Supreme Court considers three factors:

(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, (1967); Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

It is manifest that the considerations which require our rejection of the district court's former grand jury selection procedure are not grounded in the Constitution, Hoyt v. Florida, *supra.* Moreover, that procedure posed no demon-

strated threat to the integrity of the fact-finding process. Only when such considerations are present is there a rational basis for retroactive application. *E.g.,* Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel), held retroactive in Doughty v. Maxwell, 376 U.S. 202, 84 S. Ct. 702, 11 L.Ed.2d 650 (1964); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (right to confront and cross examine witnesses), held retroactive in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968) and Barber v. Page, 390 U. S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), held retroactive in Berger v. California, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed. 2d 811 (1963) (right to counsel on appeal), held retroactive in Smith v. Crouse, 378 U.S. 584, 84 S.Ct. 1929, 12 L.Ed.2d 1039 (1964); Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1970) (right to counsel at sentencing), held retroactive in McConnell v. Rhay, 393 U.S. 2, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968); White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (right to counsel at preliminary hearings in which substantial rights may be adversely affected), held retroactive in Arsenault v. Massachusetts, 393 U.S. 5, 89 S.Ct. 35, 21 L.Ed.2d 5 (1968).

■ Generally, rulings not primarily designed to enhance the reliability of the *fact-finding or truth-determining* process have not been applied retroactively. The exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) was held not to be fully retroactive in Linkletter v. Walker, *supra.* The rule of Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1955), forbidding prosecutorial comment on the defendant's failure to testify was denied complete retroactive effect in Tehan v. United States ex rel. Shott, *supra.* Johnson v. New Jersey, *supra,* denied retroactivity to the landmark decisions of Escobedo v. Illinois, 378 U. S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977

(1964) and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. And this court in United States ex rel. Allison v. New Jersey, 418 F.2d 332 (1969), denied retroactivity to the doctrine of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), except as to those cases which were on final appeal on the date of the decision. United States ex rel. O'Connor v. New Jersey, 405 F.2d 632 (3 Cir.), cert. denied Yeager v. O'Connor, 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969).

The significant extent to which the court and administrators of the New Jersey district relied upon the prior state of the law is obvious. No defendant has ever tested the grand jury selection process by appeal to this court. It was, therefore, understandable that the district court was satisfied with the exposition of the law as set forth in *American Oil, supra*. Moreover, we have assumed throughout our deliberations that no suspect motive has underlain the development of this defective jury selection process. Had the reliance been less than absolute, a simple procedural change would no doubt have been instituted.

Finally, notwithstanding limitations on the applicability of this decision presented by the 1968 Act and Fed.R. Crim.Pro. 6(b) and 12(b), we are concerned that the application of full retroactivity could have a profound effect on the administration of criminal justice. Where a challenge to the jury selection process has been preserved and the statute of limitations has run, no new indictment could be returned. In cases in which the statutory limitation has not expired, reindictments and new trials would be required, creating serious, adverse effects on criminal trial calendars. The Supreme Court has relied on this factor in denying full retroactivity: United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (line-up cases), held non-retroactive in Stovall v. Denno, *supra*; McCarthy v.

United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) (on-the-record guilty plea colloquy), denied retroactive application in Halliday v. United States, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969).

 All three considerations indicate that full retroactivity should not be accorded this decision. We therefore conclude that our decision, which invalidates the grand jury selection procedure utilizing a two-to-one ratio based on sex, shall apply only to those cases in which proper and timely challenges to the grand jury selection procedure were made and on which trials have not been had or, if trials have been completed, are on direct appeal on this date.

The judgments of conviction will be reversed.