The order of the district court will be affirmed.

**Catherine FOSTER et al., on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,**

v.

**James L. SPARKS et al., etc., Defendants-Appellees.**

**No. 73–3732.**

United States Court of Appeals, Fifth Circuit.

Jan. 20, 1975.

C. B. King, Herbert E. Phipps, Albany, Ga., Jack Greenberg, Charles S. Ralston, New York City, for plaintiffs-appellants.

Jesse G. Bowles, Cuthbert, Ga., for defendants-appellees.

Before RIVES, GEWIN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

On May 26, 1972, five named black and female adult citizens of Quitman County, Georgia, filed this class action in federal district court alleging that various organs of local government in their county, especially the grand and traverse (petit) juries, are so constituted as to discriminate against blacks and females, and that this unconstitutional composition has led to variegated injuries to plaintiffs and to the blacks and females whom they claim to represent. Plaintiffs asked for injunctive relief to end discrimination against black and female citizens of Quitman County with respect to the selection of grand and traverse jurors; plaintiffs also asked that the county board of education be reconstituted on a nondiscriminatory basis. After a hearing in July, 1973, the district court determined that since all the named plaintiffs were in fact on the traverse jury list, they were not members of the class they purported to represent and thus were not entitled to any relief. Accordingly, the district court dismissed the complaint on August 9, 1973. We reverse.

The statutory scheme of county government in Georgia provides that the judge of the state superior court for the circuit in which a county is located shall appoint a board of six jury commissioners, who shall be "discreet persons." Ga. Code Ann. § 59–101. These jury commissioners compile a traverse jury list of "intelligent and upright citizens of the county," and from this list select "the most experienced, intelligent, and upright persons" of 21 years of age and older for the grand jury list. Ga.Code Ann. §§ 59–106 and 59–201.[1] Members of the traverse and grand juries are then chosen at random from these lists. In addition to the judicial duties with which grand juries ordinarily concern themselves, a Georgia grand jury also discharges important administrative functions. For example, it is charged with the inspection of county roads and public buildings, Ga.Code Ann. §§ 59–314 and 59–315, and it appoints the members of the county board of education. Ga. Const. Art. VIII, § V, ¶ I, Ga.Code Ann. § 2–6801.

According to the 1970 census, there were 1313 citizens in Quitman County of 18 years of age or older, of whom 673 (51%) were black and 712 (54%) were female. On February 13, 1973, however, the Quitman County Jury Commission comprised six white males. Of the 173

---

1. Ga.Code Ann. § 59–106 provides:

 At least biennially, or, if the senior judge of the superior court shall direct, at least annually, the board of jury commissioners shall compile and maintain and revise a jury list of intelligent and upright citizens of the county to serve as jurors. In composing such list the commissioners shall select a fairly representative cross-section of the intelligent and upright citizens of the county from the official registered voters' list of the county as most recently revised by the county board of registrars or other county election officials. If at any time it appears to the jury commissioners that the jury list . . . is not a fairly representative cross-section of the intelligent and upright citizens of the county, they shall supplement such list by going out into the county and personally acquainting themselves with other citizens of the county, including intelligent and upright citizens of any significantly identifiable group in the county which may not be fairly representative thereon.

 After selecting the citizens to serve as jurors, the jury commissioners shall select from the jury list a sufficient number of the most experienced, intelligent and upright citizens, not exceeding two-fifths of the whole number, to serve as grand jurors.
 . . .

 Ga.Code Ann. § 59–201 provides:

 All citizens of this State, above the age of 21 years, being neither idiots, lunatics, nor insane, who have resided in the county for six months preceding the time of serving, and who are the most experienced, intelligent, and upright persons, are qualified, and liable to service as grand jurors.

persons on the grand jury list, only 31 (18%) were black and 13 (8%) were female. The traverse jury list contained the names of 552 persons, 134 (24%) of whom were black and 238 (43%) of whom were female. This state of affairs created a question in plaintiffs' minds as to whether something was rotten in the County of Quitman. Plaintiffs thereupon brought this class action on behalf of themselves and all blacks and females "who are . . . qualified . . . for services on grand and traverse juries," to ensure that blacks and females are fairly represented in the instruments of their county government.

Shortly after plaintiffs commenced their action, changes began to occur in Quitman County. Two white males retired from the Jury Commission and were replaced by another white male and a black male. The Jury Commission composed supplemental grand and traverse jury lists: of 297 persons on the new grand jury list, 109 (37%) were black and 83 (28%) were female; the revised traverse jury list contained the names of 738 citizens, including 255 (35%) blacks and 360 (49%) females. In late December, 1973, yet another revision of the jury lists was made, but the results of that action do not appear in the record.

In summary, black and female citizens in Quitman County have long been greatly underrepresented in the organs of county government. Plaintiffs contend that this underrepresentation is unconstitutional and that the result of this illegality has been discrimination against blacks and females in many areas of endeavor regulated by county authorities, particularly in the area of public education. Although the publication of these conditions cannot have been a revelation to the powers that be in Quitman County, this lawsuit has triggered significant changes in the composition of county government. The precise extent and significance of those changes will be determined by the district court on remand, if that court finds that this lawsuit can go forward as a class action.

I

Rule 23(a) of the Federal Rules of Civil Procedure provides that:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

 Although the determination of the propriety of a class action is ordinarily a matter within the sound discretion of the trial court, Johnson v. Georgia Highway Express, Inc., 5 Cir. 1969, 417 F.2d 1122, we believe that the district court erred in dismissing this lawsuit. The district court acted on the theory that since all of the named plaintiffs were actually on the traverse jury list, they could not complain of injury and were not members of the proposed class. Perhaps because the language of the complaint was less clear than it might have been, the district court was under the impression that the plaintiffs wanted only to be considered for the grand and traverse jury lists without discrimination as to race or sex, and reasoned that since plaintiffs had been selected for the traverse jury rolls, they had suffered no injury. In fact, the named plaintiffs were not on the grand jury list and were certainly aggrieved in that respect. What is of more import is the fact that the thrust of plaintiffs' complaint is not that they have been injured because they have been excluded as individuals from the grand or traverse jury lists because of race or sex discrimination. Rather, they contend that blacks as a class and females as a class have been systematically excluded from participation in the government of Quitman County, and that these class exclusions have skewed public actions in the county in a manner unfavorable to blacks and females. Plaintiffs would derive little comfort

from personal participation in county government if the selection process were such as to ensure that they could participate only as token blacks and females in unconstitutionally unrepresentative white, male institutions.

█ Plaintiffs' complaint is clearly an attack on an alleged systematic discrimination against blacks and females in the selection of names for grand and traverse jury lists in Quitman County, a discrimination that is all the more pernicious because of the primacy of the grand jury in Georgia county government. Plaintiffs in such a class action may represent all individuals who suffer from systematic discrimination, and not just those individuals who may have endured the specific injury inflicted upon the named plaintiffs. Potts v. Flax, 5 Cir. 1963, 313 F.2d 284. For example, in Johnson v. Georgia Highway Express, Inc., *supra,* this Court determined that a black man allegedly discharged as a result of discriminatory employment practices could represent a class of all blacks who had been discriminated against by the defendant employer, and not just those blacks who had been discharged illegally. We recently encountered a somewhat analogous situation in Long v. Sapp, 5 Cir. 1974, 502 F.2d 34, and found that although the black, female plaintiff there had been discharged in a lawful manner, that circumstance was no bar to her status as a proper representative in a class action on behalf of all blacks and females victimized by allegedly discriminatory employment practices.

Plaintiffs here are certainly members of the class they purport to represent, and the record seems to indicate that they are proper representatives of the class, that plaintiffs possess "the nexus with the class and its interests and claims which is embraced in the various requirements of [Rule] 23(a) and (b)." Huff v. N.D. Cass Company, 5 Cir. 1973 (en banc), 485 F.2d 710, 714. Since the district court stopped on the threshold of Rule 23, however, we remand the case to that court for a determination as to whether plaintiffs' claims are typical of the claims of the class, and whether the plaintiffs will fairly and adequately protect the interests of the class.

## II

Since 1875, the criminal laws of the United States have provided that:

No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000. 18 U.S.C. § 243.

The reason for this longstanding concern that juries be selected without invidious discrimination was succinctly stated by the United States Supreme Court in Smith v. Texas, 1940, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84, 86:

It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.

In view of the venerable nature of the federal jury discrimination statute and the fundamentality of the principle opposing such discriminatory practices, defendants' suggestion that they did not realize that it was illegal to discriminate against blacks and women in the jury selection process, and that as soon as this lawsuit apprised them of the contrary, they took corrective action which has resulted in constitutional grand and traverse jury lists, is disingenuous at best.

Plaintiffs attack the constitutionality of the jury selection process in Quitman County by examining the means utilized

and the results achieved. They contend that the Georgia statutory language regarding "intelligent and upright" traverse jurors and "most experienced, intelligent and upright" grand jurors has been manipulated by the white, male jury commissioners to produce predominantly white male jury lists in a county whose population is predominantly black and female. Plaintiffs submit the jury lists as proof of the discrimination.

■ The United States Supreme Court scrutinized the Georgia jury selection statutes in Turner v. Fouche, 1970, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567, and found them to be constitutionally acceptable:

> Georgia's constitutional and statutory scheme for selecting its grand juries and boards of education is not inherently unfair, or necessarily incapable of administration without regard to race; the federal courts are not powerless to remedy unconstitutional departures from Georgia law by declaratory and injunctive relief. The challenged provisions do not refer to race; indeed, they impose on the jury commissioners the affirmative duty to supplement the jury lists by going out into the county and personally acquainting themselves with other citizens of the county whenever the jury lists in existence do not fairly represent a cross section of the county's upright and intelligent citizens. 396 U.S. at 355, 90 S.Ct. at 537, 24 L.Ed.2d at 575–576.

The Turner Court also found, however, that a substantial disparity existed between the percentages of black residents in the county as a whole and of blacks on the jury list. This disparity, when added to plaintiffs' showing that the disparity occurred at precisely that point in the selection process where random selection gave way to subjective judgment, where words such as "most experienced, intelligent and upright" entered the calculus, made out a prima facie case of jury discrimination.

■ This Court has made it absolutely clear that a significant disparity between the demographic patterns in a county and the relative percentages of each demographic group selected for the jury lists may warrant ·corrective action by a federal court absent a countervailing explanation by the jury commission. Broadway v. Culpepper, 5 Cir. 1971, 439 F.2d 1253; Preston v. Mandeville, 5 Cir. 1970, 428 F.2d 1392. See Turner v. Fouche, supra. The district court in an injunctive case such as this one may exact from the jury commissioners "a high standard of comparability between demographic percentages and those of the jury list." Broadway ·v. Culpepper, supra, 439 F.2d at 1259.

For the convenience of the district court on remand, we append Judge Gewin's scholarly and comprehensive study of federal jury selection law, "An Analysis of Jury Selection Decisions," noting that federal law in this area may differ from Georgia law in some particulars, and that Judge Gewin's work is of a persuasive rather than a precedential nature.[2]

In conclusion, one hundred years after discrimination in jury selection was made a federal crime, we remand this jury discrimination case to the district court for further proceedings consistent with this opinion. Defendants contend that they have now complied with the mandates of Georgia law and of the United States Constitution. If the district court should decide that the named plaintiffs can maintain this class action, then that court will afford defendants an opportunity to demonstrate that the millenium has arrived in Quitman County. Class actions are potent and effective tools in enforcing statutory and constitutional rights. We must not lightly dull their cutting edge in the sacred area of the jury selection process.

Reversed and remanded.

---

2. Judge Gewin did not participate in the decision to include the "Analysis;" that decision was made by Judges Rives and Goldberg.

APPENDIX

## AN ANALYSIS OF JURY SELECTION DECISIONS
by
Hon. Walter P. Gewin,
United States Circuit Judge

## INDEX

| A | ACT | REPORT |
|---|---|---|
| Actual Voters | | 816 |
| Assumption of Faithful Discharge of Duty to Neutrally Operate Selection System | | 830–832 |
| **C** | | |
| Challenging Compliance with Act as Opposed to Constitutional Challenge | 1867 | 814 |
| Cognizable Class | . | 819, 820–821 |
| Age | | 823–824 |
| Alienage | | 821, 823 |
| Economic Status | | 824–825 |
| Less Educated | | 825–826 |
| Sex | | 826–828 |
| Religion | | 823 |
| Compartmentalization | | 835–836 |
| Compensation—Jurors | 1864(a) | 824 |
| Criminal Sanctions | 1864(b), 1866(g) | 824 |
| **D** | | |
| Demarcation Point | | 830–836 |
| Population v. Eligibles | | 832 |
| Venire Panel and Immediate Jury | | 833 |
| Absolute v. Comparative | | 834 |
| Compartmentalization | | 835 |
| Deviation from Statutory Procedure and *Swain* | | 828 |
| Discretion Limited | | 815 |
| Discrimination Prohibited | 1862 | 820 |
| Discriminatory Purpose & Effect | | 821–823 |
| Dispensations | | 815, 826–828 |
| District Court, Responsibility | | 815, 817 |
| Division | 1863(a), 1869(e) | 815 |
| Drawing from Master Wheel | 1864(a) | 815 |
| **E** | | |
| Effect of Discrimination | | 821–823 |
| Emptying Wheel and Refilling | | 823 |
| Excuses | 1863(b)(5) | 815 |
| Automatic | | 815 |
| Temporary | | 815–828 |
| Exemptions | 1863(b)(6) | 815 |
| **F** | | |
| Fair Cross Section | | 817–819, 833 |

| H | ACT | REPORT |
|---|---|---|
| Hardship Excuse (women) | | 827 |
| Harmless Error (substantial deviation from proportional representation) | 1867 | 828 |

| I | | |
|---|---|---|
| Invidious Discrimination | | 819 |

| J | | |
|---|---|---|
| Juror Qualification Form | 1864(a) 1869(h) | 824, 825 |

| L | | |
|---|---|---|
| Lists of Actual Voters | 1863(b)(2) | 816 |
| Literacy (less-educated) | | 825–826 |

| M | | |
|---|---|---|
| Master Wheel | 1866(e) | 814, 835 |
| Measure of Disparities— Absolute v. Comparative | | 834 |
| Mirror of Community | | 816 |

| N | | |
|---|---|---|
| Neutral Operation of Selection System | | 828–829, 830 |

| O | | |
|---|---|---|
| Objective-Subjective Criteria | | 815, 826 |
| Other Sources (Supplementation) | 1863(b)(2) | 815–817 |

| P | | |
|---|---|---|
| Percentage Deficiency Test | | 818 |
| Peremptory Challenges (Swain) | | 822 |
| Periodic Emptying and Refilling | 1863(b)(4) | 823 |
| Personal Predilection | | 824 |
| Preferred Source | | 816 |
| Plan Requirements | | 815 |
| Prima Facie Case | | 819–828, 830 |
| Purposeful Discrimination | | 821–823 |

| Q | | |
|---|---|---|
| Qualification Form | | 825 |
| Qualifications for Service Education—Literacy | 1865 | 825 |
| Qualified Wheel | 1866(a) | 815 |
| Questioning Jurors | 1864(a) | 825 |

| R | | |
|---|---|---|
| Random Selection | 1861, 1863(a), 1863(b)(3), 1864(a), 1866(c), 1866(f) | 836 |
| Rebuttal to Prima Facie Case | | 824, 828, 830–832 |
| Registration Lists | | 816 |
| Reviewing Panel | | 813, 815, 817 |
| Rule of Exclusion | | 815, 822 |

| | ACT | REPORT |
|---|---|---|
| **S** | | |
| Sources | | 815–819, fn. 32, 818 |
| Sufficiency of Mere Statistical Proof | | 829 |
| Stauber Report | | 818 |
| Subjective-Objective Criteria | | 815, 826 |
| Substantial Deviation from Proportional Representation | | 817 |
| Substantial Failure to Comply | 1867 | 828 |
| Supervisory Power | | 814, 824 |
| Supplementation | | 816–817 |
| **T** | | |
| Temporary Excuses (sex) | 1866(c) | 826 |
| Tolerance Levels | | 831 |
| **V** | | |
| Vitiating Prima Facie Case | | 824, 826, 827, 830–832 |
| Voter Lists | | 816 |
| Voter Registration Lists | 1863(b)(2), 1869(c) | 816, 818 |

## AN ANALYSIS OF JURY SELECTION DECISIONS

Pursuant to an assignment of the Committee on the Operation of the Jury System, a subcommittee comprised of Judges Gewin, Heaney and Corcoran[1] has conducted a study of the adjudication of challenges to the jury selection and service system in federal courts.[2] In submitting our conclusions for your scrutiny we solicit any suggestions or criticisms the committee may wish to offer that will aid in making an accurate and illuminating analysis of the Federal jury selection system currently in use.

This study focuses upon the most volatile sources of litigation under the Federal Jury Selection and Service Act[3]: source selection, the elements of the prima facie case, the nature of discrimination required to be proved—whether of purpose or effect, and the efficacy and proper use of statistical proof in the resolution of a jury selection challenge. It is the purport of this study to accomplish two goals. The first is to cordon off the most fruitful sources of attack in a challenge and recapitulate the various judicial responses to them. Certain sources of dilution of representation in the selection process have not been deemed cognizable in a litigious context and hence closer approximation of a cross section will if desirable, be obtainable through vehicles other than the judiciary. Specifically, the committee will have to determine whether it is satisfied with the results achieved under the Act or whether, in view of the self-imposed limitations on judicial monitoring, it desires to press for further salutary change at the behest of Congress or to establish specific guidelines for those who formulate district or division jury plans. The

1. The Subcommittee acknowledges with grateful appreciation the excellent assistance of Jay H. Bernstein, law clerk to Judge Gewin, in the preparation of this analysis.

2. *See* Memorandum from the Honorable Arthur J. Stanley, Jr., Chairman of the Committee on the Operation of the Jury System to the Chief Justice of the United States, Chairman, and Members of the Judicial Conference of the United States, at 10 (September 1973, denominated as Agenda F–6).

3. 28 U.S.C. § 1861 et seq. (1968).

second aim is to highlight the analytical frameworks adopted by various courts in disposing of jury challenges based on the above mentioned four areas of contention. Among other reasons, Congress was impelled to enact the Act by its desire to standardize selection procedures in the federal system. The judiciary can do much to promote uniformity by minimizing differences in analysis which have heretofore surfaced in the most fertile areas of litigation.

The source material for this inquiry consisted essentially of a large number of Supreme Court and lower federal court pronouncements in jury discrimination cases. Our conclusions are extrapolated from resolutions of challenges to both grand and petit juries. Since the principles underlying discrimination in selection of the two bodies essentially coincide,[4] and indeed under the Act, selection of both proceeds from the master jury wheel,[5] we have refrained from expressly acknowledging differences in the two types of challenges. We have also relied upon explications of the constitutionality of state selection procedures as equally illuminating as those federal challenges grounded on noncompliance with the Act. The great majority of Supreme Court decisions appear in state challenges,[6] and hence a doctrinaire refusal to consider constitutional adjudications would leave us largely bereft of guidance from this Court. It should be noted, too, that section 1867(e) of the Act preserves the vehicle of constitutional challenge, even though noncompliance with § 1867 may foreclose statutory attack.[7] Moreover, the raison d'etre for judicial monitoring in both federal statutory and constitutional adjudications is the same—not to assure proportional representation on a particular jury but rather to preserve fairness in the selection process.[8] Despite the fact that selection may be subject to a more exacting command under the federal supervisory power than it is under the Constitution,[9] we have made equal avail of statutory and constitutional dispositions, ac-

4. *See* Alexander v. Louisiana, 405 U.S. 625, 626 n. 3, 92 S.Ct. 1221, 1223 n. 3, 31 L.Ed.2d 536, 539 n. 3 (1972); Pierre v. Louisiana, 306 U.S. 354, 362, 59 S.Ct. 536, 83 L.Ed. 757 (1939).

5. *See* 28 U.S.C. § 1864 (1970).

6. *See, e.g.,* Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Carter v. Jury Commission of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964); Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Reece v. Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947); Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Martin v. Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497 (1906); Carter v. Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839 (1900); Gibson v. Mississippi, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075 (1896); Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1880); Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880). Challenges to federal selection standards were resolved by the Supreme Court in Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) and Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1940).

7. 28 U.S.C. § 1867(e) (1970). For a case in which statutory attack was foreclosed, but constitutional attack remained available, *see* United States v. De Alba Conrado, 481 F.2d 1266 (5th Cir. 1973).

8. *Compare, e.g.,* Akins v. Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945) *and* Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567, 572 (1880) *with* United States v. De Alba Conrado, 481 F.2d 1266 (5th Cir. 1973).

9. *See* United States v. Butera, 420 F.2d 564, 568 n. 7 (1st Cir. 1970). Several courts have maintained that judicial powers under the two are coterminous. *See* United States v. DiTommaso, 405 F.2d 385, 390 (4th Cir. 1968); Rabinowitz v. United States, 366 F.2d 34, 78 (5th Cir. 1966) (Brown, J., concurring); *id.* at 79 n. 2 (Bell, J., dissenting).

centuating differences between the two primarily where constitutional principles may be less strenuous than statutory mandates.

## I

### Source Selection

Having offered these prefatory remarks, we turn now to a consideration of litigation under the Act. Although familiar to all members of this committee, a review of certain provisions of the Act may be appropriate. The scheme set forth streamlines the selection process by exercising almost all potential sources of subjectivity in jury selection, but yet allows for flexibility by relegating the task of formulating plans to a judicial district-division level. Under § 1863, each district or division is required to adopt a formal written plan, to be scrutinized by a reviewing panel comprised of members of the appropriate judicial council and either the chief judge of the appropriate district or some other active district judge designated by the chief judge. This written plan must prescribe a source for the selection of names for the master jury wheel [10] which should insure that each political subdivision of a district or division is "substantially proportionally represented in the master jury wheel." [11] The plan must also specify groups whose members may individually request permanent excuse from service,[12] groups whose members are exempt,[13] the basis for mandatory individual excuses,[14] the basis upon which individuals may request temporary excuse,[15] and a procedure for assigning jurors whose names have been drawn from the qualified wheel to grand and petit jury panels.[16] These requirements, in departing from prior federal reliance upon state qualifications, have precipitated a transition in the judicial role when considering jury selection challenges. Discrimination, as proved in the "rule of exclusion" cases,[17] is an anachronism. Official tampering with the selection procedures is easily ascertainable because of the detailed selection procedures prescribed in the Act. Moreover, unless such tampering constitutes an insubstantial deviation from statutory prescriptions,[18] it will readily activate judicial disapprobation.

Nevertheless, infection of the cross sectional goal may occur in two areas: source selection and dispensations through excuses and exemptions. Since a separate committee has been commis-

---

10. 28 U.S.C. § 1863(b)(2) (1970). The Act is comprehensively reviewed in Guidelines to Assist District Courts in Conforming to the Jury Selection & Service Act of 1968, prepared by the Committee on the Operation of the Jury System.

11. 28 U.S.C. § 1863(b)(3) (1970). ·

12. 28 U.S.C. § 1863(b)(5). *See* S.Rep. 981, 90th Cong., 1st Sess. at 28–29 (1967) which enunciates the following guidelines:

Such groups might include among others, doctors, ministers, sole proprietors of businesses, and mothers with young children. Members of excused groups could serve if they desired to do so, but a request for an excuse must be granted. For example, a mother with young children might prefer to hire a babysitter in order to be free for jury duty, but if she chooses not to hire one her request for an excuse must be granted.

13. 28 U.S.C. § 1863(b)(6) (1970). Each plan must include mandatory exemptions for members of the Armed Forces on active duty, members of professional fire and police departments, and public officers of the United States, state or local governments who are in active service. The court in its plan may exempt other groups if it finds such an exemption would be in the public interest.

14. 28 U.S.C. § 1863(b)(7) (1970).

15. 28 U.S.C. § 1866(c)(1) (1970).

16. 28 U.S.C. § 1863(b)(9) (1970).

17. *See, e. g.,* Norris v. Alabama, *supra*; Pierre v. Louisiana, *supra*; Patton v. Mississippi, *supra*.

18. 28 U.S.C. § 1867(4) (1970). *See* United States v. Matthews, 350 F.Supp. 1103, 1111 (D.Del.1972) (where plan called for 2,400 people in the master wheel and a drawing from the voter registration list produced 2,378 names from 3 counties comprising Delaware district, the addition of 62 names solely from 1 of the 3 counties did not constitute a substantial failure to comply).

sioned to study the latter,[19] our observations are confined to the former.

The Act delegates to the district court the task of selecting either voter registration lists or lists of actual voters as the source of names for the master jury wheel. The former are preferred,[20] and at the present time, all jurisdictions employ them as the primary source.[21] The eight year administration of the Voting Rights Act of 1965 [22] has largely attenuated if not removed salient differentials in black and white registration figures in the North and South and hence muted the most fundamental objection to the use of registration lists as a source. The following statistics support this conclusion:

Characteristics of Persons of Voting Age
1964 to 1968 [23]

| | % of White Registered | % of Negro Registered |
| --- | --- | --- |
| South | 64.3% | 53.0% |
| United States | 71.6% | 60.3% |

Despite the virtual unanimity with which registration lists are heralded as the most attractive source list, Congress saw fit to enunciate a duty to supplement the source lists where necessary to protect the rights secured by §§ 1861 and 1862. The circumstances under which this duty is to be activated were left unspecified. The only Congressional cue appears in the following:

The voting list need not perfectly mirror the percentage structure of the community. But any substantial deviations must be corrected by use of supplemental sources. Your committee would leave the definition of substantial to the process of judicial decision.[24]

The sole additional guidance is furnished by the observation that the disparity must be "great" or "pronounced" [25] and the suggestion that substantiality be tested by the ease or difficulty by which the disparity could be eliminated.[26]

The courts, in taking the congressional cue, have deemed a substantial deviation tantamount to a constitutional infirmity.[27] We are aware of no case in

19. Memorandum from Judge Stanley, Chairman, Committee on the Operation of the Jury System to the Chief Justice of the United States, Chairman, and Members of the Judicial Conference of the United States at 7–8 (September, 1973).

20. H.Rep.No.1076, 90th Cong., 2d Sess. 10 (1968); Hearings before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 90th Cong., 1st Sess. at 43 (1967); Statement re S 989 (Jury Selection & Service Bill of 1967) by Judge Irving Kaufman before the United States Senate Committee on Improvements in Judicial Machinery, in Works of the Committee on the Operation of the Jury System of The Judicial Conference of the United States 1966–1973, 44, 45–46 (1973) (hereinafter cited as *Works, 1966–1973*); Report of the District Court Panel on Jury Selection in the District of Massachusetts, 58 F.R.D. 501, 506 (1973) (hereinafter cited as Massachusetts Report).

21. *See* Massachusetts Report, at 505–506. Public Law 92–269, 86 Stat. 117 (1972) compelled the District of Columbia to abandon the city directory as a source and to use voter registration lists.

22. 42 U.S.C. §§ 1973–1973p (1970).

23. *See* Census Document Series P–20, No. 172, May 3, 1968.

24. S.Rep.No.981, 90th Cong., 1st Sess. at 17 (1967).

25. *See* 114 Cong. Rec. 1348 (daily ed. Feb. 21, 1968) (statement of Congressman Kastenmeier).

26. Gewin, The Jury Selection and Service Act of 1968: Implementation In the Fifth Circuit Court of Appeals, 2 Mercer L.Rev. 349, 383 (1969).

27. *See, e. g.*, United States v. Lewis, 472 F.2d 252 (3d Cir. 1973); United States v. Dellinger, 472 F.2d 340 (7th Cir. 1972); United States v.

which exclusive reliance on voter registration lists has been invalidated.[28] In the only case where it was intimated that supplementation may have been appropriate, the court relied not upon the disproportionate representation of a particular group appearing on the list but rather upon the unlikelihood that a registration list containing only half the eligible voting age population could produce a fair cross section.[29]

The reason for judicial reluctance to treat "substantial deviation" as anything less than a constitutional deficiency is unclear. To speculate, perhaps it can be ascribed to the limited efficacy of data on both registration and voting age populations. Disparities between the two can frequently be attributed to personal predilection not to register as opposed to state or locally imposed impediments. And courts have uniformly maintained that such predilections cannot form the basis of a cognizable class and evoke judicial sanctions against the selection system.[30]

A second potential explanation for the judicial bent with respect to registration challenges is that information available for determining eligible voting age population is statistically wanting. The most reliable source, the Bureau of the Census Report, cannot be used to accurately categorize racial demographic breakdowns. Racial proportions listed are based upon self-identification of those responding to census questionnaires and may, on that account, lead to inaccuracy. A more rudimentary limitation is that the Census Reports classify the population into four categories: (1) all races, (2) white, (3) negro and (4) other. This latter class poses computational difficulties because racial breakdowns may vary radically according to whether "other" is computed as part of the negro or white segment. For example, in Minnesota, the Census Report shows roughly 34,000 negro and 34,000 other, in Montana, 1,195 negro and 29,371 other, and in California, 1,400,000 negro and 791,959 other.[31]

A constitutional deficiency standard may tolerate a margin of error spurred by inaccurate data. Since the Jury Selection and Service Act commands disapproval of discrepancies attributable to official participation in the selection procedure, this standard has the salutary effect of reining *judicial review* to comport with general congressional intent. Nevertheless, there are those who may contend that the constitutional standard goes too far in insulating plans from judicial monitoring. We would suggest that where the application of this standard results in pronounced dilution of proportionate representation, district courts formulating the plans, although not constitutionally or statutorily required to do so, may of their own volition seek supplementation. This view, while mindful of a proper judicial role in a litigious context,

Guzman, 468 F.2d 1245 (2d Cir. 1972); United States v. Hyde, 448 F.2d 815, 830 (5th Cir. 1971); United States v. Bennett, 445 F.2d 638 (9th Cir. 1971); United States v. Parker, 428 F.2d 488 (9th Cir. 1970); United States v. Dangler, 422 F.2d 344 (5th Cir. 1970); United States v. Arnett, 342 F.Supp. 1255 (D.Mass. 1970).

28. For a sampling of authority upholding such use, see United States v. Dellinger, *supra*; United States v. Gast, 457 F.2d 141 (7th Cir. 1972); United States v. Bennett, *supra*; United States v. Parker, *supra*; Simmons v. United States, 406 F.2d 456 (5th Cir. 1969); Chance v. United States, 322 F.2d 201 (5th Cir. 1963); Gorin v. United States, 313 F.2d 641, 644 (1st Cir. 1963).

29. United States v. Hunt, 265 F.Supp. 178, 201 (W.D.Tex.1967), aff'd, 400 F.2d 306 (5th Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 566 (1969) (registration list containing 200,000 names with eligible population comprising 400,000).

30. See United States v. Lewis, *supra*; Camp v. United States, 413 F.2d 419, 421 (5th Cir. 1969); United States v. Dangler, *supra*; United States v. Arnett, *supra*.

31. See U. S. Dept. of Commerce, 1970 Census of Population, PC (V2)-1, at 6, 10, 11 (Feb. 1971). Professor Moore encountered a similar problem in evaluating the import of responses to JS-12 form questionnaires. See Moore, Report on Jury Selection Process in United States District Courts, Commentary on Unknowns (April 1973).

is sensitive to the possibility that deleterious effects may be occasioned by source selection free from official wrongdoing.[32] The planners could adopt any one of a number of suggested guidelines for measuring cross sectional representation.

The United States Commission on Civil Rights proposes that any disparity of 20% or more between the proportion of eligible whites selected for master jury wheel and proportion of eligible minority persons selected be remedied by supplementation.[33] Under this measure, if 70% of the voting age population of whites are registered, then at least 56% of the voting age population of negroes must be eligible for the jury wheel. (56 is 80% of 70 (80 = 100–20) ).

A second suggestion, advanced by Professor Henry B. Moore, Professor of Economics & Director of the Center for Business & Economic Research, University of Alabama, is as follows:

"Fair cross-sectional representation" is defined as the range of ten percentage points above and below the relevant percentage of voter age population. For example, if nonwhites represent 40% of the voter age population of a district, it is assumed for present purposes that nonwhites would be cross-sectionally represented in the master jury wheel if nonwhites represented any percentage from 30 to 50% of the names in the wheel.[34]

A third proposal, grounded in the laws of probability and statistics, is to ascertain whether the proportion in which various characteristics of the population found in the master jury wheel vary from those in populations by more than might be expected if the wheels were in fact randomly selected samples from populations. The "Stauber Report",[35] which contains these complicated computations, proffers the following example:

Thus, if the population of a given area is 80% white, and a random sample of 5,000 is selected, the probability is approximately 85% that the proportion of the sample comprising white population will be between 78.9% and 81.1%. The probability is approximately 99% that the proportion of white population in the sample will be between 78.5% and 81.5%. The probability is about 1% that the proportion of the sample consisting of white races in a random sample will fall outside the latter limits.[36]

The final alternative heretofore advanced is the percentage deficiency test, the operation of which is characterized as follows:

If a 20% "deficiency" is to be allowed, this means that where nonwhites comprise 30% of the eligible population, they must comprise no less than 24% of the names in the jury wheel. The 20% deficiency standard is computed as the difference between 30% and 24% of 6%, expressed as a proportion of 30%. Thus, 6/30 = 20%. In other words, the disparity of 6% between nonwhite share in voting age population and nonwhite share in the jury wheel is 20% of the nonwhite percentage of the population. (6/30 = 20%) [37]

---

**32.** See Works, 1966-1973, at 109. This suggestion is not free from all difficulty because all sources except for voter registration lists are viewed as having substantial shortcomings. See Hearings before Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 90th Cong., 1st Sess. 43 (1967); Letter from William B. Eldridge, Director of Research, Federal Research Center to the Honorable Walter P. Gewin, at 2 (September 21, 1973).

**33.** The first, second and fourth proposals are set forth in Gewin, Should Guidelines be Established for Determining When District Courts Should Use Other Sources of Names of Prospective Jurors in Addition to Voter Registration Lists or Lists of Actual Voters, and, if so, What Guidelines Should be Used. In Works, 1966-1973, 102, 107–108.

**34.** Id. at 108.

**35.** Report by B. R. Stauber to William B. Eldridge, Director of Research, The Federal Judicial Center (July 9, 1973).

**36.** Id. at 2.

**37.** See Gewin, note 33, supra, at 108-109.

Irrespective of the measure upon which a particular district or division plan chooses to rely, it is clear that they could more easily digest and utilize it at the plan formulation stage than at the litigious stage where courts, because of imposing caseloads, might lack the time for extensive fact gathering, research and analysis. Moreover, the synthesis of such input at the planning stage, based on statistics and not cognizable constitutional or statutory prescriptions, leaves the courts free to retain their proper judicial role in an adjudicatory context.

## II

### The Prima Facie Case

Successful statutory challenge to a jury selection system hinges, in the first instance, on meeting the elements of the prima facie case, the component parts of which are first, proof that the system is disadvantageous to a cognizable class, and second, proof that the disadvantage is occasioned by discrimination in the selection process. It may be argued that the statutory prima facie case finds its constitutional analogue in the term "invidious discrimination", as employed by Justice White.[38] Since, however, other Justices have given the term "invidious" a divergent meaning,[39] it is precarious to equate it with the statutory prima facie case.

This section reviews the considerations involved in determining when a particular class is cognizable and the nature of the proof of discrimination required—whether of purpose or effect—and traces the case law developed in challenges alleging exclusion on the basis of age, economic status, educational level and sex. In endeavoring to avoid an overlap with the inquiry concerning statistical proof of the prima facie case, the subcommittee has attempted to confine its observations in this section largely to conceptual matters.

### A. Cognizability

The derivation of the cognizability requirement is customarily attributed to the following language contained in Hernandez v. Texas:

Whether such a group exists [the subject of community prejudice] is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated.[40]

It is instructive to note that Hernandez entailed a constitutional and not a statutory challenge to jury selection. Since the Supreme Court's discussion of cognizability was prompted by the Texas claim that there are only two classes—white and black—within the contem-

---

**38.** This characterization of Justice White's analysis is predicated on the fact that he suggests that a prima facie case of invidious discrimination can be rebutted. So employed, the phrase "invidious discrimination" could not represent an ultimate determination of constitutional infirmity. See, e. g., Gaffney v. Cummings, 412 U.S. 735, 745, 93 S.Ct. 2321, 2330, 37 L.Ed.2d 298, 307 (1973); White v. Regester, 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973). See also Schlib v. Kuebel, 404 U.S. 357, 365, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971).

**39.** Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (treating "invidious" as ultimate finding); Lehnhausen v. Lake Shore Auto Parts, 410 U.S. 356, 93 S.Ct.

1001, 35 L.Ed.2d 351 (1973) (test of infirmity under equal protection clause is whether difference in treatment is an invidious discrimination); San Antonio School District v. Rodriguez, 411 U.S. 1, 59–60, 93 S.Ct. 1278, 1310, 36 L.Ed.2d 16, 58 (1973) (Stewart, J., concurring) (invidious discrimination occurs where a classification is wholly arbitrary or capricious). We reiterate what Mr. Justice White noted in his concurrence in Vlandis v. Kline, 412 U.S. 441, 445–446, 93 S.Ct. 2230, 2232, 37 L.Ed.2d 67, 75 (1973) (White J., concurring) that the Court has employed a spectrum of standards in reviewing equal protection cases.

**40.** 347 U.S. 475, 478, 74 S.Ct. 667, 670 98 L.Ed. 866, 870 (1954).

plation of the fourteenth amendment,[41] cognizability could have been confined to equal protection and not statutory adjudications.

In engrafting the cognizability requirement onto statutory jury challenges, courts have unequivocally rejected this confining construction. Cognizability derives meaning from the nature of the injury alleged, i. e. that because of discrimination in selection procedures, juries are not being drawn from a fair cross section of the community. The existence of infection to the fair cross sectional ideal is witnessed by the presence of discrimination against a group that is distinct. Such distinctness must be shown both in terms of size of the group and the unique nature of prejudice which afflicts it.

In racial discrimination cases, courts obviate the need for proof of "size" by taking judicial notice of cognizability.[42] Hence, were a sole eligible black resident of a community overtly excluded from the selection process, a criminal defendant's challenge to the composition of his jury would very likely succeed. Judicial sanctions would be imposed not because of any flouting of the cross sectional principle—indeed the cross section may have been present [43]—but rather because state fostered or imposed discrimination is simply inimical to the Constitution.

A more pronounced breakdown in uniformity of analysis appears in treatment of the second component of cognizability—the showing of prejudice. In Hernandez v. Texas, the Supreme Court listed several factors as contributing to its affirmative finding. First, the residents of the community, in their attitudes, distinguished between whites and Mexican-Americans; second, participation of Mexican-Americans in business and community groups was marginal; third, until just prior to 1955, Mexican-American children were required to attend special schools (though for concededly benign reasons), and fourth, Mexican-Americans were confined to separate restaurant and toilet facilities throughout the community.[44] Clearly, the contextual base for measuring prejudice was the local community and not a national one. Nevertheless, in cases where "age" is asserted to demark a cognizable class, courts have evaluated prejudice in a national rather than a local environment.[45]

A third development worthy of observation is that a refined development of the relationship between cognizability and the proscriptions of section 1862 against discrimination on account of race, color, sex, national origin, religion, or economic status is conspicuously absent from case law. There is limited support for the view that the section's proscriptions should have a bearing upon the judicial inquiry.[46] A contrary suggestion would invariably lead to the conclusion that the congressional pronouncement was surplusage because in any event, the federal supervisory power

41. 347 U.S. at 477, 74 S.Ct. at 669, 98 L.Ed. at 870. Viewed solely from a constitutional perspective, the Hernandez language could be deemed the precursor of the suspect classification terminology, employed for the first time only a short time later in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

42. See, e. g., Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950) where while announcing that proportional racial limitation was impermissible, the Court nevertheless did not consider the cognizability of Negroes.

43. See Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). We would note, moreover, where allegations of racial discrimination are read in other contexts, a rigorous showing of cognizability is not required. Thus, in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) the Supreme Court did not discuss in detail or emphasize the question of cognizability, despite belabored findings by the district court on this issue.

44. 347 U.S. at 479–480, 74 S.Ct. at 671, 98 L.Ed. at 870–871.

45. See, e. g., United States v. Guzman, 468 F.2d 1245, 1247 (2d Cir. 1972); United States v. Ross, 468 F.2d 1213, 1217 (9th Cir. 1972). But cf. United States v. Butera, 420 F.2d 564, 572 n.18 (1st Cir. 1970).

46. United States v. Guzman, 468 F.2d 1245, 1248 n. 6 (2d Cir. 1972); United States v. Kuhn, 441 F.2d 179, 181 n. 3 (5th Cir. 1971).

over federal jury selection is arguably broad enough to justify the same scrutiny that section 1862 invites. We posit an explanation of the relationship between cognizability and section 1862, mindful of the fact that this relationship is of largely conceptual and not practical significance. Again, our concern is with tightening the analytical framework employed in resolving jury selection challenges.

Once the fact of bearing is assumed, one must determine on which element and to what degree section 1862 alters the customary inquiry. Since Congress would hardly be in a position to determine that Mexican-Americans, for example, are of sufficient magnitude in a particular community to satisfy the size component of cognizability, it is apparent that section 1862 could have a bearing only upon the degree of prejudice required to be proven. To what degree remains an open issue. If the bearing is anything less than judicial notice, any attempt to elaborate would entail sheer speculation. If tantamount to judicial notice, the challenger's burden to establish the cognizability element of the prima facie case would be attenuated, but the level of proof of discrimination would remain intact.

One final development is the increasing tendency of courts to define a class in terms of the means utilized for allegedly discriminating against it. In "age" cases, for example, an objection can frequently be ascribed to the time lag between eligibility to vote, inclusion on the voter registration lists, and the four year period during which refilling of the master jury wheel is not required. In such cases, the inaccessibility to jury service is attributable not to age discrimination but to the time lag.[47] Similarly, the citizenship qualification does preclude unnaturalized citizens from participating in jury service. But the root cause of the exclusion is not alienage as such but rather failure to undergo the naturalization process.[48] So viewed, this qualification would not effect any impermissible exclusion.[49] Careful examination of the source of alleged discrimination will help to bring out similar refined judgments in other jury discrimination cases.

### B. Discrimination—Purpose or Effect

The second component of the prima facie case is proof that discrimination

47. See United States v. Gooding, 473 F.2d 425, 430 (5th Cir. 1973); United States v. Blair, 470 F.2d 331 (5th Cir. 1972); United States v. Pentado, 463 F.2d 355 (5th Cir. 1972); United States v. Kuhn, 441 F.2d 179 (5th Cir. 1971). Section 1863(b)(4) of the Act was amended by Pub.L. 92–269 (April 6, 1972) to provide that each master wheel be emptied and refilled by September 1, 1973 and no less often than each four years thereafter.

48. E. g., in Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973) where a petitioner had challenged Farah's practice of refusing to hire aliens as violative of § 703 of Title VII of the Equal Employment Opportunities Act, the Supreme Court held that the term "national origin" appearing in the Act did not embrace citizenship and hence concluded that the Farah policy did not conflict with the statute. The Court noted that Mrs. Espinoza "was denied employment not because of the country of her origin, but because she had not yet achieved United States citizenship." Id. 414 U.S. at 93, 94 S.Ct. at 339, 38 L.Ed.2d at 294.

49. The argument that exclusion of aliens, effected by a citizenship qualification for jury service, is unconstitutional would be based on the holdings in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) and In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) that classifications based on alienage are suspect. Anticipating the use to which its holding would be put, however, the Supreme Court spoke decisively to this argument in Sugarman:

> This Court has never held that aliens have a constitutional right to vote or to hold high public office under the Equal Protection clause. Indeed, implicit in many of this Court's voting rights decisions is the notion that citizenship is a permissible criterion for limiting such rights.

413 U.S. at 648, 93 S.Ct. at 2851, 37 L.Ed.2d at 863–864. The claim that a citizenship qualification effects an unconstitutional exclusion on account of national origin is presently being considered in Perkins v. Smith et al., Civil Action No. 73–222 (complaint filed March 9, 1973) (District of Maryland).

occurred. Whether the discriminatory effect or result of a selection procedure suffices without proof of discriminatory purpose is the critical issue. Because the grounds articulated by courts in dismissing suits may sometimes merely mimic those presented in briefs and argument, it is difficult to pinpoint the precise stance taken by a particular court on this issue. Nevertheless, assuming the proffered rationales can be taken at face value, courts line up on both sides of the polemic.[50]

The dichotomy in views appears to have been spawned by the Supreme Court's pronouncement in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) that a ten percent disparity between the proportion of blacks eligible for jury service and the proportion appearing on petit and grand jury venires did not evidence purposeful discrimination. A closer examination of the arguments advanced by Swain and the Supreme Court's responses, however, supports the view that purposefulness is not the exclusive means of showing discrimination. Swain's contention, predicated on the rule of exclusion cases where purpose is readily inferred from the continued unexplained absence of blacks from jury panels,[51] was that the prosecutor had utilized the device of peremptory challenges to exclude Negroes appearing on the venire from petit jury panels. The Court was reluctant to adopt the "rule of exclusion" rationale under these circumstances, reasoning that in the absence of proof of persistent abusive use of peremptory challenges to effect exclusion, to endorse Swain's rationale would jeopardize the efficacy of the device. Moreover, since it had previously characterized Alabama selection procedures as free from constitutional infirmity[52] and thereby foreclosed the only viable basis for proof of discriminatory operation of the selection system, the Court had no alternative but to couch its dismissal of Swain's unconventional "rule of exclusion" argument in terms of purposefulness.

To read Swain as limiting proof of discrimination to a showing of purposefulness would spawn a judicial anomaly in the equal protection area. The Supreme Court has long acknowledged the hazards involved in testing constitutionality by legislative motive[53] and has been equally sensitive to charges of sophisticated as well as naive modes of discrimination.[54] Moreover, it has repeatedly entertained contentions that a legislative or administrative scheme operates to discriminate without requiring that evidence of purposeful discrimination be adduced.[55] Swain should not be read to depart from established principles enunciated by the Supreme Court. Rather, proof which evidences neglect or

50. Compare, e. g., United States v. Hamling, 481 F.2d 307 (9th Cir. 1973); United States v. Valentine, 288 F.Supp. 957 (D.P.R.1968) (purpose is exclusive means of showing discrimination) with, e. g. United States v. Gooding, 473 F.2d 425, 429 (5th Cir. 1973); United States v. Gordon, 455 F.2d 398, 401 (8th Cir. 1972); United States v. Zirpolo, 450 F.2d 424, 428–429 (3d Cir. 1971); United States v. Di-Tommaso, 405 F.2d 388, 391 (4th Cir. 1968); Rabinowitz v. United States, 366 F.2d 34, 56 (5th Cir. 1966); Brooks v. Beto, 366 F.2d 1, 12 (5th Cir. 1966); United States v. Leonetti, 291 F.Supp. 461, 473 (S.D.N.Y.1968) (discriminatory effect is sufficient).

51. See, e. g., Whitus v. Georgia, 385 U.S. 545, 550–551, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Hernandez v. Texas, 347 U.S. 475, 480–481, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Avery v. Georgia, 345 U.S. 559, 562–563, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); Patton v. Mississippi,

332 U.S. 463, 468, 68 S.Ct. 184, 92 L.Ed. 76 (1947); Hill v. Texas, 316 U.S. 400, 404–405, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Norris v. Alabama, 294 U.S. 587, 591, 55 S.Ct. 579, 79 L.Ed. 1074 (1935).

52. 380 U.S. at 209, 85 S.Ct. at 829, 13 L.Ed.2d at 766.

53. See Daniel v. Family Security Life Ins. Co., 336 U.S. 220, 224, 69 S.Ct. 550, 93 L.Ed. 632 (1949).

54. See Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939).

55. See, e. g., San Antonio School District v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16, 33 (1973); Jefferson v. Hackney, 406 U.S. 535, 547, 548, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1973); Bullock v. Carter, 405 U.S. 134, 143–144, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

the arbitrary quality of thoughtlessness involving clear overtones of racial discrimination and resulting in the same evils which characterize intentional or purposeful discrimination should suffice.[56] Ignorance of the inadequacy of selection procedures would be as reprehensible as knowledge of such inadequacy and unwillingness to rectify.[57]

The meaning of discriminatory purpose could thence be explained in two ways. One such explanation would be that the term connotes malevolent motive. Since this is irreconcilable with decisions which decry well-intentioned but nevertheless deliberate exclusions,[58] the second and preferable explanation is that purpose connotes deliberate, intentional or knowing as opposed to inadvertent interference with the selection system, irrespective of the design with which such deliberate interference is undertaken.

## C. Practical Application

Not surprisingly, in most jury selection challenges the alleged cognizable class is race or color. Religious challenges have been infrequent, and national origin litigation closely approximates that in race cases.[59] Challenges based on other cate-gories have been more numerous but by and large equally unavailing. This portion of the study briefly recounts the obstacles confronted in challenges based on age, economic status, educational status and sex.

## 1. Age

Challenges based upon discrimination against a particular age grouping have met with virtually unanimous failure. Without exception, courts have sustained the exclusion of 18–21 years,[60] now muted in part by the reduction of the minimum age eligibility from 21 to 18. Exclusions of the 21–23 and 21–25 age groupings occasioned by lags in refilling jury wheels have also been tolerated by the courts.[61] Explanations for these dispositions are that proof of either cognizability or of discrimination is wanting.[62]

The one exceptional case is United States v. Butera, 420 F.2d 564 (1st Cir. 1970), where proof of exclusion in various components of a 21–40 age grouping was predicated on a comparison of the jury pool with a hypothetical true cross section—what the composition should have been in an accurate cross sectional representation. The evidence thus adduced indicated that there were only 148

---

**56.** *See* Hawkins v. Town of Shaw, 461 F.2d 1171, 1173 (5th Cir. 1972); United States ex rel. Seals v. Wiman, 304 F.2d 53, 65 (5th Cir. 1962), *cf.* Rabinowitz v. United States, 366 F.2d 34, 66 (1966); Brooks v. Beto, 366 F.2d 1, 12 (5th Cir. 1966).

**57.** *Cf.* Cassell v. Texas, 339 U.S. 282, 289–290, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Hill v. Texas, 316 U.S. 400, 404, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942).

**58.** Thiel v. Southern Pacific Co., 328 U.S. 217, 224, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (daily wage earners for financial reasons); Glasser v. United States, 315 U.S. 60, 83–86, 62 S.Ct. 457, 86 L.Ed. 680 (1940) (women who were not members of League of Women Voters for domestic reasons).

**59.** One religious challenge coming to our attention is United States v. Suskin, 450 F.2d 596 (2d Cir. 1971). Aside from Hernandez v. Texas, *supra,* we would refer the committee to United States v. De Alba Conrado, 481 F.2d 1266 (5th Cir. 1973) and Muniz v. Beto, 434 F.2d 697 (5th Cir. 1970) as representative of national origin cases. In Keyes v. Denver Independent Community School District, 413 U.S. 189, 196–197, 93 S.Ct. 2686, 2691, 37 L.Ed.2d 548, 556 (1973), the Supreme Court rejected a wooden differentiation between discrimination on the basis of race and national origin.

**60.** *See, e. g.,* United States v. Ross, 468 F.2d 1213 (9th Cir. 1972); United States v. Olson, 473 F.2d 686 (8th Cir.), cert. denied, 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973); United States v. Guzman, 468 F.2d 1245, 1247 n. 21 (2d Cir. 1972); United States v. McVean, 436 F.2d 1120 (5th Cir. 1971).

**61.** *See* United States v. Kuhn, 441 F.2d 179 (5th Cir. 1971); King v. United States, 346 F.2d 123 (1st Cir. 1965).

**62.** *Compare* United States v. Ross, 468 F.2d 1213, 1217 (9th Cir. 1972); United States v. Kuhn, *supra*; King v. United States, *supra*; United States v. Allen, 445 F.2d 849 (5th Cir. 1971) *with* United States v. Guzman, *supra*; United States v. Bryant, 291 F.Supp. 542 (D.Me.1968).

in a jury pool under 40 while the true cross section indicated the inclusion of 355, and only 20 under age 30 when the true cross section indicated that 147 should have been included.

It would appear at present that *Butera* must be deemed a judicial rarity. Critical to the result obtained was the fact that an age grouping spanning 20 years was involved.[63] Thus, in one case, United States v. Bryant, 291 F.Supp. 542 (D.Me.1968) proof of disparities as pronounced as those appearing in *Butera* was held not to satisfy the prima facie case where the age grouping spanned 21–29 year olds. In part the *Bryant* court relied upon the speculative government assertion that disparities would probably be attributable to absence from school, military service and young mothers. Normally, such an assertion should have been conceived of as merely the rebuttal of a prima facie case, in which case other than cursory assertions would have been required. In age discrimination cases, courts have been inclined to deem such assertions as vitiating a prima facie case where disparities though pronounced are not so great as to preclude the possibility that the natural operation of the selection procedures may be accompanied by dilution of youth participation in jury service.[64]

## 2. Economic Status

Section 1862 prohibits the exclusion of individuals from the selection process on account of economic status. To the extent that the federal supervisory power over federal juries supported the invalidation of an exclusion of wage earners in Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), this section codifies pre-existing law. It is not likely to have a substantial impact on litigation however, for the principal reason that absent a wholesale exclusion,[65] proof of discrimination is extremely difficult to adduce. Underrepresentation in the jury wheel, or more fundamentally, underrepresentation on registration lists, can often be ascribed to personal predilections not to register. And personal predilections cannot invalidate the use of registration lists as a source. Another potential source of systematic exclusion—the hardship excuse—should not provide much of an opportunity for exclusion in the future because of the fee paid for service and recently proposed legislation which proscribes the imposition by employers of sanctions upon those employees who take leave from work for jury service.[66]

Moreover, the difficulty of compiling data on economic status forbodes the failure of challenges because of evidentiary deficiencies.[67] At present it is un-

---

**63.** This explanation was adopted in United States v. Ross, *supra.*

**64.** In *Bryant,* the comparative statistics between eligible population and composition in the pool for the 21–29 age group were 21 v. 161 for the Northern Division of Maine and 70 v. 147 for the Southern Division; the statistics for the respective division in the 30–39 age bracket were 106 v. 171 and 128 v. 188. The Court concluded that these disparities did not establish a prima facie case. ·

**65.** *See* Thiel v. Southern Pacific Co., *supra*; Labat v. Bennett, 365 F.2d 698 (5th Cir., 1966) (exclusion of daily wage earners implicating racial discrimination violates equal protection and due process). *Cf.* United States v. Andrews, 462 F.2d 914 (1st Cir., 1972) where the court raised the possibility that exclusive reliance on registration lists might be impermissible because paupers were ineli-

gible to vote. The resolution of this issue was preempted by the Massachusetts Judicial Committee Study which found that no paupers were excluded from jury service. *See* 58 F.R.D. at 504.

**66.** *See* 28 U.S.C. § 1871 (1970); H.R. 10689, 92nd Cong., 1st Sess. (1971). This bill was not reported out of conference. The suggestion was made to impose civil not criminal sanctions. *See* Hearings Before Subcommittee No. 5 of the House Committee on the Judiciary, 92nd Cong., 1st Sess. (1971) (Serial 16). Subsequently, the Judicial Conference transmitted a bill to Congress which would impose civil sanctions. *See* H.R. 10897, pending 93rd Cong., 1st Sess.

**67.** *See, e. g.,* United States v. James, 453 F.2d 27 (9th Cir. 1971); United States v. Tijerina, 446 F.2d 675 (10th Cir. 1971).

clear whether income or occupation is the proper index for data gathering. Theoretically, information concerning either could be readily obtained by inclusion of a question on the subject in the juror qualification form and comparing the answer with census data. The limitations of using either index are, however, severe. As to using income:

First, it is very sensitive information to collect and utilize. If we tried to add a section to the sample questionnaires that probed income we would probably get a lot of resistance from potential dependents and a host of related questions. In order to get enough to be of any real use, we probably would have to cross privacy boundaries that we don't want to cross. Furthermore, it seems to me that if there are biases connected to economic status, maintaining a representative income pattern on jury wheels is probably not a very meaningful hedge against the biases.[68]

Proof based on occupational classification presents different but equally formidable impediments to accurate analysis. Regulation four of the Resolution and Regulations Implementing the Juror Selection Reporting Requirements of the Jury Selection and Service Act of 1968 (April, 1973) deletes any reference on the JS–12 form to job classification and hence such data is not easily obtainable. Even before the deletion, however, the synthesis of such data was difficult. Since sixteen classifications appeared on

the JS–12 form, used in the sampling procedure, classification invariably depended upon the collective judgment of those who answered the form and the clerks who categorized the answers. In an earlier and more simple economy, when different forms of employment were more limited and less capable of producing widely varying incomes, such classification might have been manageable.[69] Today it would produce largely unreliable data, hardly a basis for reasoned judicial decisions.[70]

### 3. Less Educated

Challenges bottomed on the alleged exclusion of this class encounter impediments similar to those experienced in age litigation. Because high intelligence of jurors has long been valued,[71] and the Act itself preconditions eligibility upon literacy,[72] rigorous proof of exclusion should be required. By the same token, however, because the cross sectional ideal cannot be sacrificed for competency[73] and because intelligence qualifications can be pretextually interposed to disqualify otherwise eligible individuals[74] challenges should not be cavalierly dismissed.

Underrepresentation is most likely to occur at the voter registration and questionnaire stages. Exclusion of the less educated from registration lists is of no moment unless it amounts to a constitutional infirmity. The ranks of "less educated" to whom a qualification form is sent may be depleted merely because of

68. Letter from William B. Eldridge, Director of Research, The Federal Judicial Center, to the Honorable Walter P. Gewin, at 2 (Oct. 26, 1973). See also letter from the Honorable Irving Kaufman to the Honorable Walter P. Gewin, at 2 (Oct. 9, 1973).

69. The court in United States v. Hunt, 265 F.Supp. 178 (W.D.Tex.1967) articulated this reasoning.

70. See Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947) where in an attack levelled against the New York procedure of empaneling blue ribbon or special juries in certain cases, defendant's tabulation of occupational breakdowns was deemed inefficacious because it did not relate jurors con-

sidered to the industries in which they were classified, 332 U.S. at 273–274, 67 S.Ct. at 1620–1621, 91 L.Ed. at 2052.

71. Carter v. Jury Comm'n of Greene County, 396 U.S. 320, 332, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); Glasser v. United States, 315 U.S. 60, 86, 62 S.Ct. 457, 86 L.Ed. 680 (1940); Gibson v. Mississippi, 162 U.S. 565, 589, 16 S.Ct. 904, 40 L.Ed. 1075 (1896).

72. 28 U.S.C. § 1865(b)(2).

73. Glasser v. United States, 315 U.S. 60, 86, 62 S.Ct. 457, 86 L.Ed. 680 (1940); Rabinowitz v. United States, 366 F.2d 34, 55 (5th Cir. 1966).

74. See United States v. Duke, 263 F.Supp. 828, 836 (S.D.Ind.1967).

failure to fill out and return the form.[75] A careful follow-through by those responsible for administering the jury system can be of some help in ameliorating this factor. Further depletion may occur because under § 1864(a), a person who, after completing the form, appears for jury service may be required to fill out an additional juror qualification form in cases where literacy is in doubt. Although the legislative history makes it clear that objectivity not subjectivity is to be the talisman at this stage,[76] the potential for subjectivity is present to a degree. However, it could be minimized in large part by providing in a district plan that completion of a specific number of years of education qualifies an individual as literate,[77] and that those who lack the requisite schooling can demonstrate literacy by other objective means. For example, in United States v. Henderson, 298 F.2d 522 (7th Cir. 1962) the lack of an eighth grade education was not preclusive but rather necessitated closer scrutiny of the nature of Henderson's employment to ascertain if it indicated such responsibility, ability or experience as to evidence an equivalent degree of intelligence. The provision for alternative means of qualifying as literate would appear to be critical, in view of the Supreme Court's continued disapproval of presumptions which have a preclusive effect.[78] Such a provision

would not however, vitiate the invalidity of an unnecessarily stringent school requirement.

Assuming, however, that a plan, on its face or as administered, contains no patent infirmity, establishment of the prima facie case is difficult. Although the cognizability requirement would not appear to impose a serious impediment,[79] courts, as in age cases, are receptive to the explanation that legitimate qualification standards account for certain disparities and hence hold that the prima facie case has not been met. For example, in United States v. Bryant, 291 F.Supp. 542 (D.Me.1968) the court was unswayed by evidence which revealed that 7% of those in the jury pool had less than an eighth grade education while comprising 36.4% of the population and that 83.7% in the pool had at least a high school diploma while the concomitant percentage of the population was 43.2. Although the reasoning employed by the court is not free from ambiguity, it appears that it was premised on the lack of a prima facie case,[80] and not on the government's rebuttal thereto.

### 4. Sex

By proscribing discrimination on the basis of sex, § 1862 undercuts the import of the Supreme Court's venerable dicta that a state may constitutionally confine jury service to males.[81] A blanket exclu-

---

75. See 28 U.S.C. § 1864 (1970).

76. See S.Rep. No. 981, 90th Cong., 1st Sess. at 30 (1967); H.Rep. No. 1076, 90th Cong., 2d Sess. at 12 (1968).

77. A variety of demarcation lines have been suggested. See Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966) (sixth grade); United States v. Henderson, 298 F.2d 522 (7th Cir. 1962) (8th grade).

78. See Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed. 90 (1971).

79. See United States v. Butera, 420 F.2d 564, 571 (1st Cir. 1970) (holding "less educated" are a cognizable class); United States v. Bryant, 291 F.Supp. 542, 551 (D.Me.1968) (rejecting attack on insufficient proof of discrimination and not lack of cognizability).

80. See also United States v. DiTommaso, 405 F.2d 385, 388 (4th Cir. 1968), cert. denied, 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969) prima facie case not established by evidence that while over 50% of eligible population had less than a high school diploma, only 33% were drawn for the petit jury venire and only 21.9% served on grand jury. But see United States v. Butera, 420 F.2d 564, 571 (1st Cir. 1970) (holding that proof that 83.6% of jury pools had high school diplomas while only 43.2% of population over 25 did and proof that 18.1% of pool had college degree as compared with 5% of the population gave rise to inference of discrimination).

81. See Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664, 666 (1880); Gibson v. Mississippi, 162 U.S. 565, 580, 16 S.Ct. 904, 40 L.Ed. 1075 (1896).

sion of women is clearly impermissible.[82] A partial exclusion, effectuated by a selection procedure not comporting with the Act, would also be invalid.[83] The most critical question in this area is how to reconcile the prohibition of § 1862 with the fact that the Act does contemplate that plans will prescribe dispensations from service—permanent and temporary excuses, and individual and group exemptions—the former two of which are likely to be availed of by some women.

The wording of the dispensation would seem to be critical. Although the Supreme Court held in Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961) that requiring females to register their desire to be placed on a jury list is constitutionally permissible, its recent disapprobation of differential preferences for males over females [84] casts aspersions on the viability of *Hoyt*. Thus, in Healy v. Edwards, 363 F.Supp. 1110 (E.D.La.1973), a three judge court invalidated a Louisiana statute which provided that women were exempt from jury service unless they filed with the clerk a written declaration of their desire to serve. This benign dispensation, contributing to jury panels that had never included greater than 5% women, was similar to that countenanced in *Hoyt*.

The dispensation is more likely to take the form of a § 1866(c) hardship excuse, and specifically a provision that pregnant women or women with children under 10 years of age may temporarily be excused from service. While § 1866(c) contemplates merely a temporary release from the duty to serve, both of the aforementioned excuses would be marked by the requisite characteristics of inconvenience to withstand attack premised on the theory that such provisions in a plan do not comport with what the statute envisions for temporary excuses. Moreover, being rationally related to a legitimate purpose, these excuses would most likely survive a constitutional objection.[85] Indeed, this would appear to be the unarticulated assumption underlying the decision in United States v. DiTommaso, 405 F.2d 385, 391 (4th Cir. 1968) where the court ascribed statistical discrepancies to possible reluctance on the part of key men to suggest the names of women preoccupied with childrearing. The assumption of constitutionality was expressed in United States v. Butera, 420 F.2d 564, 573 (1st Cir. 1970) where a prima facie case, based on mere statistics, was deemed to be explained by proof that a jury wheel of 900 was selected in part by resort to a key man system and pared down by granting hardship excuses to women, grounded on employment or childrearing commitments.

As in the educational status and age discrimination cases, courts will have to determine the proper sequential framework for taking cognizance of these legitimate explanations for underrepresentation of women. Although one court has considered the dispensations as rebutting the prima facie case,[86] it seems likely that a majority of courts will follow the practice adopted in age and edu-

**82.** *See* 28 U.S.C. § 1862 (1970); White v. Crook, 251 F.Supp. 401 (M.D.Ala.1966); *cf.* Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (total exclusion invalidated under federal supervisory power).

**83.** *See* United States v. Zirpolo, 450 F.2d 424 (3d Cir. 1971) (nonrandom drawing of jury panels from file cards segregated as to sex).

**84.** *See* Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

**85.** In *Richardson*, only four Justices agreed that classifications based on sex were sus-

pect. Had a fifth Justice joined in this conclusion, a state would be required to show a compelling justification for the differential treatment accorded males and females under the hardship excuse. Although as Chief Justice Burger lamented in Dunn v. Blumstein, 405 U.S. 330, 363–364, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (Burger, C. J., dissenting), the Court has never deemed a "state interest" sufficiently compelling to override the stigma of suspectness, one could convincingly argue that a hardship excuse should qualify as such.

cational status cases of taking account of the dispensations in determining whether a particular statistical disparity arises to the level of a prima facie case.[87]

## III

### Statistical Proof

With the standardization of selection procedures effected by the Act, the efficacy of statistical evidence in attacks upon district or division plans achieves added significance. As was noted above, while rejecting the argument that evidence of a 10–12 percent disparity between eligible Negro population and composition of jury venires, unaccompanied by a defective selection procedure, supported an allegation of purposeful discrimination, *Swain* did not address many questions concerning the type of statistical proof that would be availing. This section of the study focuses upon these questions, and suggests guidelines concerning the proper utilization of statistics in jury selection cases.

### A. Is the 10–15% Demarcation Point Absolute

Since the Court in *Swain* concluded that no infirmity existed in the Alabama selection procedure, it could be cogently argued that where there is evidence that a provision of a plan deviates from what the Act prescribes but produces a dispar-

ity short of the *Swain* 10–15%, satisfactory proof of discrimination has been adduced. Where the deviation is minimal and the statistical aberrations marginal, the statutory "harmless error" rule would require tolerance.[88] Where, however, the statutory deviation is flagrant though not producing a salient statistical disparity, the jury selection procedure may be invalidated.[89] The method of selection as well as the results flowing therefrom is a proper subject of judicial sanctions.[90]

Proceeding from the general to the specific, the question becomes under what circumstances a procedural deviation is so opprobrious as to render the size of the disparity irrelevant. The demarcation point would seem to be whether a selection procedure on its face provides an opportunity for discrimination. A source which segregates races,[91] or a selection procedure which in some stage retains a conspicuous racial designation[92] is a more likely vehicle for discrimination than, for example, a literacy qualification which is "neutral" on its face, though each is a potential source for racial exclusion. In constitutional adjudications, a court is more prone to indulge in an assumption that a statutory scheme operates to discriminate where the scheme classifies on its face, than where it does not.[93] Since the Jury

---

87. See United States v. DiTommaso, 405 F.2d 385 (4th Cir. 1968); United States v. Bryant, 291 F.Supp. 542 (D.Me.1968).

88. 28 U.S.C. § 1867(a).

89. See Cassell v. Texas, 339 U.S. 282, 287–288, 70 S.Ct. 629, 94 L.Ed. 839 (1950) (holding prima facie case shown where despite the absence of any disproportion between eligible population and composition of grand juries, evidence showed jury commissioners selecting on the basis of personal acquaintances made no effort to familiarize themselves with other eligible voters).

90. Brooks v. Beto, 366 F.2d 1, 22 n. 40 (5th Cir. 1966). Cf. Bell v. Southwell, 376 F.2d 659, 662 (5th Cir. 1967) interpreting Whitus v. Georgia to hold that actual discrimination is not even required if a racially conscious system affords an opportunity for it in practice.

91. See, e. g., Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (segregated tax books).

92. See, e. g., Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (jury questionnaire form containing color designation); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) (names of Blacks and whites in both source and functional equivalent of master jury wheel contained on different color index cards).

93. Compare, e. g., Bullock v. Carter, 405 U.S. 134, 144, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (because Texas filing fee scheme draws a wealth distinction on its face, Court stated it could not help but acknowledge its deleterious effect on the poor) with e. g., Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) (Indiana multi-member districting scheme did not classify on its face and hence Court required proof that scheme actually discriminated and would not assume that underrepresentation of ghetto residents could be ascribed to the electoral system).

Selection & Service Act in effect precludes such facial classifications, however, an averment that a particular facially neutral procedure provides an opportunity to discriminate probably would be insufficient unless the ensuing disparities were greater than those in *Swain* or unless evidence demonstrated that the opportunity was in fact utilized. It is only where the latter is shown that the import of 10–15% demarcation line in *Swain* would likely be vitiated.

## B. *Is Evidence Based Solely on Statistics Sufficient to Establish the Prima Facie Case*

Because all of the successful challenges to selection systems in the Supreme Court have been based on evidence of the "rule of exclusion" or statistical disparities coupled with a facial opportunity to discriminate,[94] we have little guidance from the Supreme Court on this point. Though not without disagreement, several lower courts have subscribed to the view that mere statistical evidence is insufficient absent additional positive indicia of discrimination or a

showing that a procedure either facially provides an opportunity to discriminate or was administered so as to effect discrimination.[95]

*Swain* would appear to have implicitly rejected such a view, if for no other reason than were a showing of mere statistical disparity insufficient, the Court's inquiry would have terminated upon its finding that the Alabama selection procedures were not defective. Justice White, it will be recalled, proceeded to consider whether a 10–15% disparity itself evidenced a purpose to discriminate. Moreover, contrary to the suggestion by one circuit,[96] in Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), the Court did not preclude the possibility that evidence of a progressive decimation of potential black grand jurors could establish a prima facie case. Rather, in the face of proof that an opportunity to discriminate clearly existed, the Court chose not to rely solely on statistics.[97] Thus, although statistics may not be as telling where other types of discrimination are involved, *i. e.*, municipal services,[98] they

---

**94.** *E. g.*, Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (opportunity to discriminate where the source, tax digests, was maintained on segregated basis); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (same); Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964) (same); Reece v. Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955) (rule of exclusion); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) (panel selected from container with different color tickets for Negroes and whites); Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939) (rule of exclusion); Hale v. Kentucky, 303 U.S. 613, 616, 58 S.Ct. 753, 82 L.Ed. 1050 (1938) (rule of exclusion); Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) (both rule of exclusion and opportunity to discriminate).

**95.** *Compare, e. g.*, Smith v. Yeager, 465 F.2d 272, 274 (3d Cir. 1972); Stephens v. Cox, 449 F.2d 657, 659 (4th Cir. 1971); Carmical v. Craven, 457 F.2d 582, 588 (9th Cir. 1971); Black v. Curb, 422 F.2d 656, 659 (5th Cir. 1970) (dicta); United States v. Leonetti, 291 F.Supp. 461, 477 (S.D.N.Y.1968) (statistics alone insufficient to establish prima facie case) *with, e. g.*, Gibson v. Blair, 467 F.2d 842, 844 (5th Cir. 1973); United States v.

. Hyde, 448 F.2d 815, 825 (5th Cir. 1971); United States v. Butera, 420 F.2d 564 (1st Cir. 1971); Rabinowitz v. United States, 366 F.2d 34, 58 (5th Cir. 1966) (Brown, J., concurring); Billingsley v. Clayton, 359 F.2d 13, 16 (5th Cir. 1965); Scott v. Walker, 358 F.2d 561 (5th Cir. 1966) (statistics sufficient).

**96.** Smith v. Yeager, 465 F.2d 272, 279 (3d Cir. 1972).

**97.** 405 U.S. at 630, 92 S.Ct. at 1225, 31 L.Ed.2d 536. "The progressive decimation of potential Negro grand jurors is indeed striking here, but we do not rest our conclusion [that a prima facie was made] . . . on statistical improbability alone."

**98.** In Hawkins v. Town of Shaw, 461 F.2d 1171, 1181 n. 7 (5th Cir. 1972), Judge Roney in dissent offered an explanation of why evidence of statistical disparities would suffice in certain types of discrimination cases:

> The principle that figures will speak persuasively in court was evolved in cases where it was clearly demonstrated that the figures would differ were it not for racial discrimination. There was some reasonable basis on which to judge what the figures would have been or what they would not have been absent racial discrimination.

are particularly persuasive where as in jury cases discrimination alone could account for most if not all disparities.

### C. Allowances for Dilution Attributable to Neutral Operation of Selection Procedures

Perhaps the most critical question in assessing the efficacy of statistical proof is to determine whether statutorily prescribed means by which disparities could rationally be accounted for can vitiate what otherwise would be a statistical prima facie showing or can merely rebut it. Underrepresentation of a race, the less educated or an economic group, for example, may be attributable to illiteracy or personal predilection not to register. Moreover, the hardship excuse is likely to result in underrepresentation of women and in the past, at least, individuals of low economic status.[99] As was noted above, some courts make an allowance for disproportions occasioned by legitimate qualifications and excuses by rejecting a proffer of statistical disparity as the prima facie case.[100] The significance of this tact is that unlike where such allowances are advanced in rebuttal to the prima facie case, courts do not require jury officials to demonstrate by precise data that such allowances do in fact account for the disparities. Rather, by and large, general asseverations of accountability suffice unless the disparities are so pronounced that the failure to register or the purported evenhanded granting of exemptions and excuses, for example, could not possibly account for them. In essence then, whether allowances are considered as vitiating the prima facie case or as rebuttal thereto determines the evidentiary burden placed upon jury officials and ultimately the success of an attack.

The propriety of treating allowances as undermining the prima facie case is contingent upon the tenability of the two unarticulated assumptions which appear to underlie it: first, and an assumption in which we indulge for purposes of this discussion, that the particular qualifications or excuses prescribed in the district plan are facially valid, and second, that the judge, clerk or commissioner charged with the duty of granting dispensations has discharged this duty faithfully.

When urged in rebuttal of proof of long continued monochromatic results, the assumption of faithful discharge has been poorly received.[101] In Norris v. Alabama, 294 U.S. 587, 594, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) the Supreme Court suggested that unless the proper application of statutory qualifications could account for all the exclusions from the jury roll of Negroes appearing in the source list, a detailed account of the reasons for such exclusion would be required in order to rebut the prima facie case.

> After eliminating those persons as to whom there was some evidence of lack of qualifications, a considerable number of others remained. * * * There is no ground for an assumption that the names of these Negroes were not on the preliminary list. The inference to be drawn from the testimony is that they were on that preliminary list, and were designated on that list as the names of Negroes, and that they were not placed on the jury roll. There was thus presented a test of the practice of the commissioners. Something more than mere general asseverations was required. Why were these names excluded from the jury roll? Was it because of lack of statutory qualifications? Were the qualifications of Negroes actually considered?

The rationale for the Supreme Court's skepticism is that legitimate qualifications, chance or accident could not

---

99. See text accompanying notes 65, 66 and notes 84, 85 supra.

100. See text accompanying notes 63, 64, 79, 80 and notes 86, 87 supra.

101. E. g., Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); Pierre v. Louisiana, 306 U.S. 354, 360, 59 S.Ct. 536, 83 L.Ed. 757 (1939).

account for long continued monochromatic jury compositions.[102]

A slightly different problem is posed where the system does not produce monochromatic results but rather pronounced disparities. In the former, it is because of the total exclusion that courts are unwilling to indulge in the assumption of faithful discharge. In the latter, a persistent pronounced disparity would similarly militate against indulgence in this assumption. In terms of Swain v. Alabama, *supra,* where a disparity greater than 10–15% is shown, the assumption of faithful discharge may be untenable. Where disparities do not reach this demarcation point, then the challenger must show that invalid jury qualifications or valid qualifications improperly applied accounted for the disparities.

We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%. . . . Here the commissioners denied that racial considerations entered into their selections of either their contacts in the community or the names of prospective jurors. There is no evidence that the commissioners applied different standards of qualifications to the Negro community than they did to the white community. Nor was there any meaningful attempt to demonstrate that the same proportion of Negroes qualified under the [same] standards being administered by the commissioners. . . . *The overall percentage disparity has been small, and reflects no studied attempt to include or exclude a specified number of Negroes.*[103]

The Court's treatment of the charge that peremptory challenges were utilized to exclude Negroes from jury panels from 1950–1965 buttresses this interpretation of the significance of the 10–15% cut off point. The 10–15% disparity existed between eligible population and composition on petit jury panels. In support of his challenge to the composition of actual juries, Swain adduced evidence that no Negro had served from 1950 to 1965. This absence from service, producing a 26% disparity between eligibles and proportion serving, customarily would have satisfied the prima facie case, and hence required detailed explanation by Alabama as to how the exclusion occurred. The Court carefully noted that the total exclusion was insufficient to establish the prima facie case, however, because state officers were not the only participants in the selection process who could avail themselves of the peremptory challenge.[104] Presumably then, where the administration of a selection procedure is vested solely in jury officials, and where statistical disparity is somewhere between 10 and 26 percent, jury officials must account for exclusion through the legitimate operation of the selection procedure in rebuttal to the prima facie case. A disparity which does not rise to the level of the demarcation point does not have to be explained or justified by them. Viewed in this light, the 10–15% figure in *Swain* thus subsumes within it a tolerance for exclusions attributable to the natural operation of the selection system, *i. e.,* literacy qualifications, excuses, etc. and up to that point, it is permissible to indulge in the assumption of faithful discharge of the selection system. Once that cut-off point is exceeded, the jury officials must by more than

---

**102.** *E. g.,* Smith v. Texas, 311 U.S. 128, 131, 61 S.Ct. 164, 85 L.Ed. 84 (1940). *Cf.* Whitus v. Georgia, 385 U.S. 545, 552 n. 2, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967).

**103.** 380 U.S. at 208–209, 85 S.Ct. at 829, 13 L.Ed.2d 759 (emphasis added) (citations omitted). *See also* Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953) where the Supreme Court intimated that rebuttal testimony that the clerk selected names on the basis of "good moral character" and those "qualified to serve as jurors" would be unavailing when a prima facie case was based on a 31 percent disparity between Negro population and the jury box composition in Vance County.

**104.** 380 U.S. at 227, 85 S.Ct. 824, 13 L.Ed. 759.

832

general asseverations, account for the disparities.

*Swain* then, established a 10–15% tolerance in race cases. The legitimate operation of the selection procedures may result in the exclusion of greater numbers of the less educated, those of low economic status, and women, and hence it may be necessary to fashion greater tolerances for each of these classes. Because no agreement upon the precise demarcation point has been reached, we merely note the judicial assessments of varying disparities below.[105] The critical point, though, is that once the percentage tolerance is formulated and proof in a particular case arises to that level, the prima facie case cannot be vitiated by indulging in the assumption that the legitimate operation of the selection system produced the disparity. The jury officials should be charged with the duty of rendering a detailed explanation of how the procedures neutrally operated to exclude the particular cognizable group as part of their rebuttal of the prima facie case.

### D. Setting a Demarcation Point

Because of the wide variety of statistical proofs that may be offered, an absolute demarcation point for each particular class cannot be fashioned and should not be applied. In one case, the comparative bases for measuring disparities may be proportion of population and composition on the jury wheel, in another they may be proportion of population eligible to serve compared with composition of the jury wheel. Proof may focus on the composition of jury venires, panels, or the immediate jury. The statistical disparities may be interpreted in absolute or comparative terms. And finally, the comparative bases of proof in particular cases may differ—in one case, it may be the eligible population and composition in the master jury wheel, in another it may be eligible population and composition of jury panels. Evaluation of the significance of disparities adduced in a particular case will depend upon each of these variables. We consider their import, seriatim.

### 1. Population v. Eligibles

Because proofs based on both eligible population and mere population have been successful,[106] it is hazardous to posit

---

**105.** For cases involving the less educated, *see* United States v. Butera, 420 F.2d 564, 571 (1st Cir. 1970) (holding prima facie case met by evidence that 83.6% of jury pools had high school diplomas while only 43.2% of population over 25 did, and proof that 18.1% of pool had college degrees as compared with 5% of population); United States v. DiTommaso, 405 F.2d 385, 388 (4th Cir. 1968) (prima facie case not met by evidence that while over 50% of eligible population had less than a high school diploma, only 33% of this group were drawn for petit jury venire and only 21.9% served on grand jury); United States v. Bryant, 291 F.Supp. 542 (D.Me.1968) (prima facie case not met by evidence that individuals with less than an eighth grade education though constituting 36.4% of the population comprised 7% of jury pool and individuals with a high school diploma, though constituting 43.2% of population comprised 83.7% of the pool).

For a case involving those of lower economic status, *see* United States v. DiTommaso, 405 F.2d 385 (4th Cir. 1968) (prima facie case not met by evidence that blue collar workers comprised 29.3% of the eligible population but only 18.6% of the jurors drawn).

For cases involving discrimination on the basis of sex, *see* Fay v. New York, 332 U.S. 261, 266 n. 4, 67 S.Ct. 1613, 1617, 91 L.Ed. 2043 (1947) (where women appear on 11% of general jury panels, it is "almost frivolous to assert that there is a bias against their inclusion"); United States v. Butera, 420 F.2d 564 (1st Cir. 1970) (prima facie case not met where women, though constituting 52% of true cross section, comprised 36% of actual jury pool); United States v. DiTommaso, 405 F.2d 385 (4th Cir. 1968) (prima facie case not met by evidence that women, though constituting 52.1% of eligible population had average representation in jury pools of 29%); United States v. Bryant, 291 F.Supp. 542 (D.Me.1968) (prima facie case not met by evidence that women though constituting 51.6% of the eligible pool in the Northern Division of Delaware and 51.5% in the Southern Division comprised 32.8% and 36.1% of the respective jury pools).

**106.** *Compare, e. g.,* Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Whitus v. Georgia, 385 U.S. 545, 87

an inflexible rule on this question.[107] Presumptive eligibles is a preferable index, for the following compelling reasons:

It seems clear that in the matter of proper representation of a certain identifiable group consideration has to be given to the number of that group who are presently eligible for inclusion in the community statutorily qualified jury pool. For instance, if an identifiable group comprises 50 percent of the population of the community but only 10 percent of that group are eligible for inclusion in the community statutorily qualified jury pool and the other group or groups constituting 50 percent of the population of the community had 50 percent of its members eligible for inclusion in the community statutorily qualified jury pool, it could hardly be successfully maintained that the first group would be entitled to have one-half of the jurors drawn from its eligibles.[108]

Nevertheless, because it may be difficult to obtain full and accurate figures for jury eligibles and to require such data may place an insuperable burden on a litigant,[109] this preference must accede to tolerance. Since, however, population may not account for certain imponderables which would dilute the number of presumptive eligibles in a cognizable class, a court should compensate by requiring evidence of a greater disparity than the customary demarcation point.[110] Swain v. Alabama, *supra* would allow for this greater tolerance because there, the 10–15% discrepancy was between presumptively eligible negroes and the proportion appearing on the jury venires.[111]

## 2. Venire, Panel and Immediate Jury

Since a litigant has no right to a grand or petit jury which itself reflects a

S.Ct. 643, 17 L.Ed.2d 599 (1967); Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Preston v. Mandeville, 428 F.2d 1392 (5th Cir. 1970); Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966); Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966), cert. denied, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967) (proof based on eligible population) *with, e. g.,* Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Gibson v. Mississippi, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075 (1896); United States v. Hamling, 481 F.2d 307, 314 (9th Cir. 1973); United States v. Butera, 420 F.2d 564 (1st Cir. 1970) (proof based on population).

**107.** Several courts have been unable to avoid this hazard. *See* Gibson v. Blair, 467 F.2d 842, 844 (5th Cir. 1973) (state habeas petitioner); Muniz v. Beto, 434 F.2d 697 (5th Cir. 1970) (same); United States v. Leonetti, 291 F.Supp. 461, 477 (S.D.N.Y.1968).

**108.** United States v. Hunt, 265 F.Supp. 178, 190–191 (W.D.Tex.1967), aff'd, 400 F.2d 306 (5th Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 566 (1969). Even the presumptively eligible index has been attacked for failing to account for legitimate causes of disqualification from source lists.

*See* Rabinowitz v. United States, 366 F.2d 34, 89 (5th Cir. 1966) (Bell, J., dissenting). If evidence based on the standard adverted to by Judge Bell were adduced, then a smaller disparity than that tolerated in *Swain* might suffice for the prima facie case, because the legitimate operation of the selection system could not be deemed to account for the disparity.

**109.** *See* United States v. Butera, 420 F.2d 564, 569–570 (1st Cir. 1970).

**110.** *Id.* at 570.

**111.** In Turner v. Fouche, 396 U.S. 346, 359, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) a 23 percent disparity between black population and composition of what was tantamount to a jury wheel was sufficient to meet the prima facie case. Since the Commissioners had interposed subjective "intelligence" and "uprightness" qualifications—171 of the 178 so excluded were negro—it is unclear whether the Court in concluding the prima facie case was met relied on the 23% disparity. In announcing that "we cannot say that the underrepresentation reflected in these figures is so insubstantial as to warrant no corrective action," 396 U.S. at 359, 90 S.Ct. at 539, 24 L.Ed.2d at 578, the Court intimated that the disparity alone was sufficient. So viewed, *Turner* established the proposition that an 8–13% additional tolerance over *Swain* is impermissible where a population index and not presumptive eligibles is used.

fair cross section of the community,[112] the index with which presumptive eligibles should be compared is jury venires and not a particular grand or petit jury.[113] Moreover, proof confined to a single venire is itself of dubious value because fortuity can account for any disproportion that may appear on a particular venire.[114] Absent evidence that either more than a mere coincidental number of immediate juries, venires or panels are similarly constituted,[115] or that qualifications or dispensations have been administered discriminatorily, proof confined to a jury plan's operation for a short duration should be received skeptically.

A problem invariably encountered in requiring evidence of a plan's operation over several years is that a district or division may adopt a new plan at short intervals. In such a case, results achieved under an analogous predecessor plan should be acceptable.[116] If schematic congruity is absent such results should again be viewed cautiously, however, because former errors cannot invalidate present or future trials.[117]

### 3. Statistical Measure—Absolute v. Comparative

The import ascribed by a court to a deviation from proportional representation will necessarily depend upon whether the deviation is viewed in absolute or comparative terms. Where, for example, negroes comprise twenty percent of the presumptively eligibles, their appearance on 10 percent of the venires can be viewed as a 10 percent deviation under the absolute view, or a 50 percent deviation under a comparative view. While there is authority for the latter measure,[118] the preferable view is that an absolute measure should be employed[119] because the comparative

112. Swain v. Alabama, 380 U.S. 202, 208, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Hoyt v. State of Florida, 368 U.S. 57, 59, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961); Cassell v. Texas, 339 U.S. 282, 286, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Akins v. Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1942); Thomas v. Texas, 212 U.S. 278, 282, 29 S.Ct. 393, 53 L.Ed. 512 (1909).

113. Swain v. Alabama, 380 U.S. 202, 204–205, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Fay v. New York, 332 U.S. 261, 284, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); Akins v. Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); United States v. Hyde, 448 F.2d 815, 824 (5th Cir. 1971); United States v. Tropiano, 418 F.2d 1069, 1079 (2d Cir. 1969); Scott v. Walker, 358 F.2d 561, 571 (5th Cir. 1966); United States v. Leonetti, 291 F.Supp. 461, 478 (S.D.N.Y.1968). See Gewin, The Jury Selection & Service Act of 1968: Implementation in the Fifth Circuit Court of Appeals, 20 Mercer L.Rev. 349, 372 (1969).

114. United States v. McIntyre, 467 F.2d 274, 276–277 (8th Cir.), cert. denied, 410 U.S. 911, 93 S.Ct. 972, 35 L.Ed.2d 274 (1972); Woods v. Beto, 348 F.Supp. 573, 577 (W.D.Tex.1972); United States v. Leonetti, 291 F.Supp. 461, 475 (S.D.N.Y.1968).

115. See generally, the rule of exclusion cases, note 51 supra; United States v. McIntyre, supra; United States v. Williams, 421 F.2d 529, 532 (8th Cir. 1970).

116. See Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) where the source utilized had previously been condemned. Avery v. Georgia, supra.

117. Brown v. Allen, 344 U.S. 443, 479, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

118. See Stephens v. Cox, 449 F.2d 657 (4th Cir. 1971) (court characterized deviation between 34% population and 14.6 and 15.74% appearance on grand and petit jury venires as 2:1); United States v. Grant, 471 F.2d 648, pet. for rehearing denied (4th Cir. 1973) (Winter, J., dissenting) (characterizing underrepresentation as from ⅓ to ½ where negroes comprised 31.9–34% of population and 20.9% of registered voters, but comprised only 14.5% of grand jurors according to 1969 sample).

119. See Smith v. Yeager, 465 F.2d 272, 279 n. 19 (3d Cir. 1972). We would note that in the majority of partial exclusion cases, the courts use an absolute not a comparative base. E. g., Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Carter v. Jury Commission of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Black v. Curb, 464 F.2d 165 (5th Cir. 1972); Preston v. Mandeville, 428 F.2d 1392 (5th Cir. 1970); Davis v. Davis, 361 F.2d 770 (5th Cir. 1966); Labat v. Bennett, 365 F.2d 698 (5th Cir.), cert. denied, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1966); Scott v. Walker, 358 F.2d 561 (5th Cir. 1966). But note that in Alexander v.

measure may distort the significance of a deviation. For example, in Dow v. Carnegie-Illinois Steel Corporation, 224 F.2d 414 (3d Cir. 1955), cert. denied, 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 evidence revealed that the negro population in the western district of Pennsylvania was 4.4% of the total, but negro composition of jurors was 2%. Under a comparative measure, the deviation would be 50% and hence require the Court to invalidate the plan. Under the absolute measure, the plan would not be infirm absent evidence that jury officials tampered with the selection process.

Conversely, an intractable use of the absolute measure may, in certain circumstances also produce distorted results. For example, if a district with 10% non-white population has .5% non-whites in the wheel, the 9.5% disparity may not evoke disapproval under an absolute measure but may require it under a comparative measure. Hence, flexible use of the two measures is advisable, with the selection of either to be guided by both a desire to avoid distorted results and a need to adequately protect the interests of those challenging the selection system.

4. *Compartmentalization*

Since the *Swain* 10–15% discrepancy was between presumptive eligibles and the negro composition on grand and petit jury panels,[120] courts should be careful not to woodenly apply this percentage figure where the data compares proportions for different stages of the selection procedure. Where, for example, there is a 10–15% discrepancy between mere population and the composition of the jury

wheels, absent additional indicia of discrimination, proof should be unavailing because disproportion can be attributable to the lack of majority status of an inordinately large portion of the negro population. The 10–15 percent deviation between eligibles and composition on jury panels, when viewed as a tolerance, does not take account of dilution because of non-majority status and hence in this hypothetical, an additional allowance for distortion may be required.[121]

Conversely, where a disparity is close to or within the *Swain* range and the comparative bases are, for example, eligible population and the composition of master jury wheels,[122] *Swain* should not be inflexibly applied to foreclose a prima facie case. In *Swain* the disparity occurred between eligibles and composition of grand and petit jury panels, after which the only additional means for exclusion was the peremptory challenge.[123] Since in the federal system, legitimate exclusion by excuses, exemptions and exclusions, can occur only after the master jury wheel is filled, it could be argued that application of the *Swain* 10–15% tolerance deviation may afford too great a margin in some circumstances in the early stages of the selection process.

The foregoing analysis reveals the need for "compartmentalization" in assessing the effectiveness of evidence adduced in a jury discrimination case. Indeed, the Supreme Court compartmentalized in *Swain*, focusing first on comparative data between eligible population and petit jury panels, and then reviewing the attack registered against the use of peremptory challenges. The significance of

---

Louisiana, 405 U.S. 625, 629–630, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), the Court characterized the progressive decimation of negroes throughout paring down stages in the grand jury selection process in both absolute and comparative terms.

**120.** Although the Court characterized the challenge as to the method of selection of venires, the comparative bases used in *Swain* were actually negro voting age population and negro composition on grand and petit jury panels. *See* 380 U.S. at 237, 85 S.Ct. 824, 13 L.Ed.2d 759 (Goldberg, J., dissenting).

**121.** The degree to which population deviates from eligible population obviously will vary. *E. g.*, Davis v. Davis, 361 F.2d 770 (5th Cir. 1966) (4% disparity); Scott v. Walker, 358 F.2d 561 (5th Cir. 1966) (1.9% disparity).

**122.** *See, e. g.*, Preston v. Mandeville, 428 F.2d 1392 (5th Cir. 1970) (finding prima facie case based on 13.3% disparity between eligibles and composition on master jury rolls).

**123.** *See* 380 U.S. at 210, 85 S.Ct. 824, 13 L.Ed.2d 759.

compartmentalization is amplified by reference to Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). In *Whitus* the proof was based on a disparity between black composition in the source, segregated tax lists (27.1%), and composition of grand and petit jury venires (9.1% and 7.8%). Since the tax lists were segregated and provided ample opportunity for discrimination, the Supreme Court had little difficulty in upholding the challenge. A challenge could also have been registered against the source itself, however, in view of a 15.5% disparity between eligible population and composition on the tax lists, or against the 33.5 percent disparity between eligibles and composition of jury venires.

Since the potential sources for exclusion in the federal selection system are readily apparent—the source, refinement from master to qualified jury wheel, and paring down from panel and array stages by the granting of temporary excuses—compartmentalization can be flexibly employed. Though its talismanic use may spawn inequities,[124] its discreet use may result in more refined judicial analysis.[125]

IV

*Conclusion*

Despite the protracted discussion of inconsistencies in the analytical framework which require some attention, the federal courts should be commended for their vigilance in insuring that rigorous adherence to the commands of the Act and the Constitution is taking place. Courts have encountered evidentiary difficulties in considering the entreaties of the less educated and of lower economic status, and hence resolution in these areas is less polished than in race, national origin, and sex cases. These difficulties are unavoidable and in any event, a plan not amenable to attack on the latter three counts in all likelihood, is not infirm for exclusion of the former three. In short, judicial administration of the Act appears to be producing that which Congress envisioned.

Since a prima facie showing can be successfully rebutted by proof that the selection procedure is being randomly maintained,[126] courts may find themselves bereft of any means to alleviate pronounced underrepresentation. If the committee is of the view that such additional means should be prescribed, we would submit that an appeal be made either to Congress—to enact more stringent guidelines—or to the jury review panels in each circuit—to encourage the drafting of district or division plans to formulate not merely plans which will avoid an infirm selection, but plans which will bring about a more representative selection. The courts cannot, how-

---

124. *See* 380 U.S. at 240–242, 85 S.Ct. 824, 13 L.Ed.2d 759 where Justice Goldberg decried the unwillingness to consider the results allegedly achieved by use of the peremptory challenge device in conjunction with the disparity between eligibles and composition of panels.

125. The categories utilized by the courts, as evidenced by a sampling of cases, are as follows:

 1. Population v. eligible population, *see* Preston v. Mandeville, 428 F.2d 1392 (5th Cir. 1970); Stephens v. Cox, 449 F.2d 657 (4th Cir. 1971).

 2. Population v. venire, *see* Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Muniz v. Beto, 434 F.2d 697 (5th Cir. 1970); Davis v. Davis, 361 F.2d 770 (5th Cir. 1966); United States ex rel. Seals v. Wiman, 304 F.2d 53 (5th Cir. 1962).

 3. Eligible population v. qualified jury wheel, *see* Carmical v. Craven, 457 F.2d 582 (9th Cir. 1971); Black v. Curb, 464 F.2d 165 (5th Cir. 1972); Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966); Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967).

 4. Composition on source v. actual service, *see* Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 19 L.Ed.2d 25 (1967).

126. *E. g.*, United States v. Butera, 420 F.2d 564, 574 (1st Cir. 1970).

ever, provide this guidance in a litigious context.

> Respectfully submitted,
> (s) Walter P. Gewin

Walter P. Gewin, Chairman of Subcommittee of Committee on the Operation of the Jury System

Subcommittee:
Honorable Walter P. Gewin, Chairman
Honorable Gerald W. Heaney
Honorable Howard F. Corcoran